RENDERED: NOVEMBER 2, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2015-SC-000483-DG

DATE 11/27/17 Kim Redmon, DC

JOHN ADAMS, M.D., AND
ELIZABETH WALKUP, A.R.N.P.

APPELLANTS

ON REVIEW FROM COURT OF APPEALS
V.      CASE NOS. 2013-CA-001159 AND 2013-CA-001461
HARDIN CIRCUIT COURT NO. 12-CI-01711

MARK SIETSEMA

APPELLEE

## OPINION OF THE COURT BY JUSTICE VENTERS

### REVERSING

Appellee, Mark Sietsema, brought this medical malpractice action alleging Appellants John Adams, M.D., and Elizabeth Walkup, A.R.N.P., were negligent in treating, or more accurately, in failing to treat, his illness while he was an inmate in the Hardin County Detention Center (HCDC), thereby causing him to unnecessarily endure days of pain and suffering. Appellee primarily asserts that Adams, as medical director for HCDC, was inattentive to inmate medical needs, and that he failed to adequately instruct the jail's medical staff how to handle patients that refuse to take medications. Appellee also asserts that Walkup negligently failed to provide the jail nursing staff with

a clear order as to when Appellee should have been taken to a hospital emergency room.

The trial court entered a summary judgment dismissing Appellee's claims against Adams and Walkup because he had no expert evidence to establish the relevant standards of care or to show that Adams' and Walkup's breach of the standard of care caused the Appellee's damages. The Court of Appeals reversed the trial court upon its conclusion that the negligent conduct asserted by Appellee fit within the *res ipsa loquitur* doctrine and thus could be sustained at trial without expert testimony.[1] Upon discretionary review, we conclude that Appellee's failure to produce expert evidence is fatal to his claim, and so, we reverse the Court of Appeals and reinstate the summary judgment granted by the trial court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Southern Health Partners, Inc. (SHP) contracted to provide health care services to inmates of HCDC, including the services of a physician. Pursuant to its contract with HCDC, SHP employed a registered nurse and several licensed practical nurses to staff the jail's medical unit around the clock. SHP contracted with Adams to serve as the jail medical director. That contract specifically designated Adams as the primary care physician for all inmates at the jail.

---

[1] The trial court dismissed the Appellee's claims against the jail nursing staff on grounds of governmental immunity. The Court of Appeals also reversed that ruling, but the pending claims between Appellee and the nurses are not part of this appeal.

Among other duties set forth in the contract, Adams agreed to "[b]e responsible to provide 24-hour continuous on-call physician coverage when in town and available;" and to "[a]ccept telephone calls from SHP personnel to evaluate medical problems and provide medical decisions, including telephone prescriptions, emergency room referrals, and such other items as are reasonably necessary." With SHP's consent, Adams employed Walkup to fulfill his duty of making weekly jail visits to monitor and evaluate the quality of patient care. Adams personally visited the jail monthly.

To facilitate Adams' assent on various medical forms used at the jail, Adams authorized Walkup to direct nurses to use his signature stamp on the forms during his absence. Walkup testified that the signature stamp was to be used to record Dr. Adams' assent on lab requests and other documents, including inmates' refusal of treatment forms. She testified that the use of the signature stamp facilitated the medical treatment of inmates by allowing essential documents to remain with the inmate's medical record, rather than setting them aside in a stack to be signed by Dr. Adams at his next jail visit. The stamped documents could then be tabbed within the medical record and easily located when she reviewed the records at her next weekly visit.

Appellee claims that the nurses' improper use of the signature stamp caused him to suffer unnecessarily over the course of several days. After experiencing fever and vomiting for two days, Appellee requested medical treatment. The next morning, a staff nurse visited him and noted his complaints of abdominal pain, nausea, vomiting, and fever. Appellee reported

3

that he had a history of diverticulitis and that a large portion of his colon had been surgically removed. The nurse initiated a course of the anti-nausea medication Phenergan and a restricted diet.

The next day, a different nurse visited Appellee. On this occasion, he did not specifically complain of abdominal pain, but he still reported nausea, vomiting, and the fever he had had for three days. The treatment plan approved by the Medical Team Administrator, Brenda Brown, R.N., prescribed a Phenergan suppository and continuation of the special diet. It also directed that Appellee be placed in isolation until his vomiting stopped.

Four days later, still in isolation, Appellee again filled out a written request for medical treatment. He complained of vomiting and constipation for six days. He requested an antibiotic and a stool softener. Walkup arrived at the jail the next day. She diagnosed his condition as diverticulitis and mild dehydration. She ordered a regimen of clear liquids for 48 hours, Phenergan, and antibiotics. She left a written order for Appellee to be taken to the emergency room if he was "unstable or unable to tolerate fluids."

The following afternoon Appellee rejected the prescribed medications. The attending nurse had him sign a "Refusal of Medical Treatment and Release of Responsibility" form and advised him to inform the medical staff if his vomiting continued. Instead of notifying Adams and securing his direct acknowledgement of Appellee's refusal of treatment, the nurse stamped his signature to the form. No one at the jail contacted Walkup during this time concerning Appellee's medical status.

4

For the next two days, Appellee continued to refuse his medication. At each refusal, the nurse completed the standard refusal of treatment form, stamping it with Adams' signature without contacting him or Walkup. On the third morning, Appellee was discovered collapsed on the floor of his cell. He again refused medication, and again, the treatment refusal form was completed and stamped with Adams' signature, and no contact was made with Adams or Walkup. After further assessment, Nurse Brown ordered that Appellee be taken to the emergency room of the local hospital. At that point, Brown informed Walkup that Appellee had been taken to the hospital, and Walkup informed Adams. Until then, Adams was never made aware of Appellee's condition, or even that Appellee was an inmate/patient at HCDC. Later, Appellee was transferred to intensive care at the University of Louisville Hospital where he underwent surgery for a bowel obstruction.

Based upon the foregoing events, Appellee brought medical negligence claims against Adams, Walkup, and the SHP nursing staff at the jail. He specifically claim that he suffered unnecessary mental and physical pain due to the three-day delay in his hospitalization, which he further claims was caused by: 1) the nurses' use of Adams' signature stamp which made it unnecessary for them to inform Adams of Appellee's condition when Appellee refused his medication; and 2) Walkup's inadequate instructions to the jail nurses about the circumstances which would compel Appellee's immediate transport to a hospital.

5

During pre-trial discovery, Appellee identified only one potential expert witness, Nurse Susan Turner. Although Turner's opinion found fault in the care provided for Appellee by the jail nursing staff, she expressed no opinion critical of Adams or Walkup. Adams and Walkup moved for summary judgment based upon the lack of evidence critical of their conduct.

The trial court concluded that Appellee could not prove liability on the part of Adams or Walkup without an expert opinion to identify how Adams' and Walkup's conduct breached the standard of care and caused injury to Appellee. The Court of Appeals reversed the trial court's decision based upon its conclusion that whether Adams or Walkup, or both of them, rendered deficient care to Appellee under the factual circumstances of this case could be determined without expert opinion.

## II. ANALYSIS

### A. A trial court's decision to grant summary judgment is subject to *de novo* appellate review.

The first point of contention addressed by the parties to this appeal concerns the standard of review by which we should judge a trial court's decision to grant summary judgment when a medical malpractice claimant fails to support his claim with expert testimony. Appellants Adams and Walkup insist that appellate review must grant substantial deference to the trial court. They argue that "abuse of discretion" is the applicable standard of review. Citing *Baptist Healthcare System, Inc. v. Miller*, 177 S.W.3d 676, 680-681 (Ky. 2005), and *Miller v. Eldridge*, 146 S.W.3d 909, 917 (Ky. 2004), they contend

that the Court of Appeals gave insufficient deference to the trial court's opinion, which they characterize as an evidentiary ruling traditionally left to the discretion of the trial court. Appellee argues that the issue upon which the trial court granted summary judgment is a question of law to be reviewed by an appellate court *de novo*.

To keep this threshold issue in its proper perspective, we should note the comment of the United States Supreme Court in *Koon v. United States*, 518 U.S. 81, 100 (1996):

> Little turns, however, on whether we label review of this particular question abuse of discretion or *de novo*, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction. A [trial] court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.

We made a similar observation in *Sargent v. Shaffer*:

> When it is argued that a trial court abused its discretion because its decision was "unsupported by sound legal principles,"[2] we must examine the application of those legal principles, and that is inherently a matter of law. We generally accord no deference to a trial court's view of the law. Thus, as a practical matter, in that limited instance there is no difference between review for abuse of discretion and *de novo* review.

467 S.W.3d 198, 203 n. 5 (Ky. 2015).

---

[2] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999): "A trial court abuses its discretion when its decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles."

Although our ultimate decision may be the same under either standard of review, we nevertheless clarify the applicable standard here. This case arose from a summary judgment entered in the trial court, which by definition is a legal, rather than factual, determination. CR 56.03. Ordinarily, "We review the trial court's issuance of summary judgment de novo and any factual findings will be upheld if supported by substantial evidence and not clearly erroneous." *Board of Regents of Northern Kentucky University v. Weickgenannt*, 485 S.W.3d 299, 306-307 (Ky. 2016) (citation omitted).

To similar effect, we said in *Shelton v. Kentucky Easter Seals Society, Inc.*, "Appellate review of a summary judgment involves only legal questions and a determination of whether a disputed material issue of fact exists. So, we operate under a de novo standard of review with no need to defer to the trial court's decision." 413 S.W.3d 901, 905 (Ky. 2013).

More specifically pertaining to summary judgments based upon the plaintiff's failure to obtain expert medical opinion testimony, we said in *Blankenship v. Collier* that "an appellate court always reviews the substance of a trial court's summary judgment ruling *de novo, i.e.,* to determine whether the record reflects a genuine issue of material fact." 302 S.W.3d 665, 668-669 (Ky. 2010). Our decision in *Blankenship* clearly recognized that, fundamentally, the lack of expert testimony is "truly a failure of proof [for which] a summary judgment is appropriate." *Id.* at 668. Whether there is "a failure of proof," or as it is sometimes called, insufficient evidence to sustain a particular claim, is a question of law. *Lackey v. Commonwealth*, 468 S.W.3d 348, 355 (Ky. 2015)

8

("The question of whether there was sufficient evidence to warrant a third-degree escape instruction is a question of law to be reviewed de novo."). Appellants' argument to the contrary stems from inartful language used in *Baptist Healthcare.*

In *Baptist Healthcare,* the trial court determined that testimony of an expert phlebotomist was an indispensable component of the plaintiff's proof. However, instead of dismissing the case on summary judgment for lack of evidence sufficient to create a genuine issue of material fact, the trial court granted a continuance allowing the plaintiff additional time to obtain the essential expert witness. *Id.* at 679-680. Ultimately, the plaintiff was successful at trial and the defendant appealed, arguing that the trial court erred by failing to grant the motion for summary judgment and, alternatively, that the trial court erred in granting the continuance. *Id.* at 680.

Upon review of the trial court's failure to grant summary judgment, the *Baptist Healthcare* Court found "no abuse of trial court discretion in continuing the case to allow Ms. Miller to identify an expert, trial court error in denying [the defendant hospital's] motion for summary judgment, or other reversible error." *Id.* at 677. The Court also noted that the "trial judge has wide discretion to admit or exclude evidence including that of expert witnesses." *Id.* at 680-681. Significantly, those references to the abuse of discretion standard do not pertain to the legal question of whether the lack of expert testimony was a failure of proof requiring dismissal of the plaintiff's claim.

9

After examining the issue in light of KRE 702-705, the *Baptist Healthcare* Court observed that while "it was not unreasonable for [the plaintiff] to contend that . . . the principle of *res ipsa loquitur* applied to the case[,] . . . the trial judge, acting well within her discretion, saw it otherwise." *Id.* at 681. This unfortunate reference to the trial court's discretion confuses the *admissibility* of expert opinion evidence with an entirely different concept: the *sufficiency* of evidence needed to sustain a claim of professional negligence. More precisely, when the issue is summary judgment, the question is not whether an expert opinion is admissible evidence; the question is whether the plaintiff can possibly demonstrate without expert opinion testimony the existence of a genuine issue of material fact as to the defendant's breach of duty or causation of damages, and thereby refute the defendant's contrary assertion.[3] KRE 702-705 deal exclusively with the admissibility of expert opinion and have nothing whatsoever to do with the elements of a tort, and whether those elements can be sufficiently proven without expert testimony.

A trial court's decision to admit or reject evidence in the form of opinion testimony under KRE 702-705 is very different from the decision to dismiss a case on summary judgment for insufficient evidence, or "a failure of proof." The former is reviewed under the abuse of discretion standard, but we have

---

[3] CR 56.03 ("[Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").

10

consistently held that the latter is a question of law to be reviewed on appeal *de novo*.

*Miller v. Eldridge* involved the applicable standard for appellate review of trial court decisions on the admissibility of scientific evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Eldridge* is not a summary judgment case, and it does not involve the question of whether an expert opinion was necessary to sustain a medical malpractice claim. Apart from our acknowledgment that "it is sometimes difficult to distinguish between the de novo, clear error, and abuse of discretion standards of review," *id.* at 917, nothing in *Eldridge* lends itself to the resolution of the issues in the instant case.[4]

## B. Appellants were entitled to summary judgment dismissing Appellee's claims against them.

Upon moving for summary judgment, Adams and Walkup had the burden of demonstrating to the trial court that Appellee's failure to come forth with expert testimony was fatal to his claims against them. Appellee responded

---

[4] In *Eldridge*, and in cases too numerous to conveniently cite here, this Court and the Court of Appeals have gratuitously recited by rote that "abuse of discretion is the proper standard of review of a trial court's evidentiary rulings." *See, for example, Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). The problem with that boilerplate language is that the phrase "evidentiary rulings" captures an extremely broad and vaguely defined range of trial court activity. A trial court's interpretation of specific provisions of the Kentucky Rules of Evidence could be called an "evidentiary ruling," but we have steadfastly held that the interpretation of our Rules of Evidence is an issue of law to be reviewed on appeal *de novo. See Meyers v. Commonwealth*, 381 S.W.3d 280, 283 (Ky. 2012). A trial court's ruling to suppress criminal evidence because of a constitutional violation is an "evidentiary ruling" but it is also a ruling that on appeal is reviewed *de novo. See Williams v. Commonwealth*, 364 S.W.3d 65, 68 (Ky. 2011). Without a more precise articulation of the rule, the best that can be said of it is that some, but not all, "evidentiary rulings" are reviewed for abuse of discretion. Clearly, some are not.

11

to their motion with the argument that under the circumstances of his case, no medical expert evidence was necessary.

Most medical malpractice claims involve issues of science or professional skill outside the ordinary experiences and range of knowledge of typical jurors and judges. For that reason, most, but certainly not all, medical malpractice claims cannot be proven without expert opinion testimony to establish that the conduct in question departed from the applicable standard of care and was a proximate cause of the damages claimed. *See Perkins v. Hausladen*, 828 S.W.2d 652, 655-656 (Ky. 1992); *Greer's Adm'r v. Harrell's Adm'r*, 206 S.W.2d 943, 946 (Ky. 1947); *Caniff v. CSX Transportation, Inc.*, 438 S.W.3d 368, 374 (Ky. 2014). The expert opinion testimony admitted in accordance with KRE 702-705 provides information to assist the finder-of-fact, either a trial judge or jury, in determining whether the conduct in question violated the standard of care and caused the damages claimed by the plaintiff.

We have recognized that in at least two circumstances the fact-finder can fairly and competently evaluate the claim without the benefit of expert opinion testimony. First are the *res ipsa loquitur* cases in which "the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts." *Jarboe v. Harting*, 397 S.W.2d 775, 778 (Ky. 1965) (citations omitted). "Expert testimony is not required . . . in *res ipsa loquitur* cases, where 'the jury may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it.'" *Blankenship*, 302 S.W.3d at 670 (citation omitted). Second, expert opinion is

12

not required "where the defendant physician makes certain admissions that make his negligence apparent." *Id.*

Neither Adams nor Walkup have admitted that they violated a standard of care and so Appellee relies upon *res ipsa loquitur* – the theory that any reasonable person could reasonably infer negligence from circumstances of the injury; or generally, that the injury could not have occurred but for the negligence of Adams or Walkup, or both of them.

### 1. Appellee's claim that Appellants Adams and Walkup negligently trained the jail nursing staff could not be sufficiently established without expert opinion testimony.

It is undisputed that Adams was never informed of Appellee's condition and that had he been so informed, he would as his duty required, have undertaken immediate steps to treat it. Appellee's theory of negligence on the part of Adams is that by allowing nurses to stamp his signature on Appellee's refusal of treatment form, Adams remained purposefully ignorant of Appellee's condition and for that reason is estopped from denying the knowledge that he admits would have prompted him to take action. A necessary ingredient of that argument is Appellee's implied assumption that the nurses were instructed that if they used the signature stamp on treatment refusal forms, there was no medical need to contact Adams or Walkup. We find no evidence to support that assumption.

The most apparent purpose of the doctor's signature, stamped or otherwise, on the refusal of treatment form is to record the fact that the doctor was made aware that the patient was not taking the prescribed medication.

13

Nothing on the form suggests to an attending nurse that the use of the doctor's signature stamp obviates the need to inform the doctor. To the ordinary medically-uneducated layperson, common sense and experience would suggest that with respect to a treatment refusal form, the signature stamp was to be used *in conjunction with a call to the doctor* who was not at the scene to sign directly, rather than *in lieu of a call to the doctor.*

We find no indication in the record that any evidence existed to show that the nurses were instructed *not* to contact Adams or Walkup when a patient refused treatment.[5] Adams testified that on most of his monthly visits to the jail he reminded the jail staff, "If you ever need me, if you ever need anything, my phone is always open."

Adams and Walkup both testified that they would have expected the nurse who filled out Appellee's refusal of medical treatment form to contact them and notify them that Appellee was refusing his medication without explicit instruction or training to do so. Adams testified, "[the SHP nurses] are licensed, seasoned nurse practitioners—licensed seasoned nurses. They had been doing general medicine for a long time. They knew what they were doing. If they saw something they didn't like, they should have picked up the phone and called me."

_____

[5] Nurses at the jail gave deposition testimony that Brown, R.N., the Medical Team Administrator, instructed them to call her, not Adams. Adams testified he was unaware of the practice and would have objected to it.

14

Adams testified that the nurses' duty to communicate with the physician does not vary based upon the institutional setting, and that the nurses at a detention facility, because of their professional training and experience, knew when a patient's circumstances required a call to the doctor. Adams also testified that in accordance with their professional training and experience, the jail nurses knew that a signature stamp did not supplant their duty to assess their patient's needs and make the clinical decision that a call to the doctor was required. Adams acknowledged that he was aware of the practice of using his signature stamp on refusal of medical treatment forms, but he explained:

> Let's say we diagnose you with tennis elbow and we give you Motrin and you refuse Motrin. That's just not that important. But if you're refusing an antibiotic for the diverticulitis, that is something important. And that's clinical decision making. They are well seasoned nurses. They know when they should call. . . . *[T]he stamp was not to keep them from being able to call me. The stamp was just used as an administrative tool to keep the paper in the chart.*

If a custom or protocol of the medical profession established a contrary standard for using the signature stamp upon which Adams and Walkup should have instructed the nurses, it was incumbent upon Appellee to produce it. In the absence of such evidence, we see no reason to suppose that the jail nursing staff would fail to contact the doctor, nor any reason to believe that Adams or Walkup should have anticipated the need to train the jail staff on the use of the signature stamp, especially on the need to call them when the patient refusing treatment had collapsed on the floor, vomiting and writhing in pain.

We disagree with the Court of Appeals' view of this case as presenting a *res ipsa loquitur* situation in which no expert testimony is needed. It would not

15

be within the common experience of the ordinary person to presume that a nurse's authority to use the doctor's signature stamp negated the need to contact the doctor about medically significant events or that a physician must train nurses on the need to contact the physician, with or without the use of a signature stamp. Expert testimony would be needed to show that the standard of care requires such training.

Although our reasoning differs somewhat from the trial court's,[6] we nevertheless agree with the trial court that the failure to train aspect of Appellee's claim of negligence required expert testimony. *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 576 (Ky. 2009) ("[A]n appellate court may affirm a lower court's decision on other grounds as long as the lower court reached the correct result.").

### 2. Appellee's claim that Walkup was negligent in the preparation of her order to the jail nursing staff could not be established without expert opinion testimony.

Appellee asserts that Walkup was negligent because her order directing the nursing staff to transport Appellee to the hospital if he was "unstable or unable to tolerate fluids" was ambiguous, thus causing the three-day delay in getting him to the hospital. In her own defense, Walkup testified in her deposition that her order, phrased as it was, properly instructed the nursing staff and that, given the symptoms they observed, compliance with

---

[6] The trial court emphasized the need for expert testimony with respect to Adams' role as a jail medical director and the training duties associated with that position. Our focus is on Adams' duties as the inmate's primary care physician.

16

her order compelled them to send Appellee to the hospital. Adams agreed, testifying that Appellee, having collapsed in his cell, was indeed "unstable," and that Walkup's order adequately communicated the need to move Appellee to a hospital without further instructions or guidance from Adams or Walkup. He added, "Often times I'll write something and [attending nurses] will call and say, we're not sure we knew what you meant, and I will clarify immediately. So if the order was not understood or ambiguous at all, there should have been a phone call asking for clarification of the order."

We agree with the trial court's summary disposition of this issue. The meaning of Walkup's order and its application to Appellee's condition is not something that "any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care." *Perkins*, 828 S.W.2d at 655 (citations omitted). The *res ipsa loquitur* doctrine we have recognized in other circumstances is inapplicable here. Expert testimony was necessary to establish that Walkup was negligent in the preparation of her order.

### III.    CONCLUSION

In summary, we conclude that the trial court's decision to grant summary judgment based upon a failure of proof is subject to *de novo* review on appeal. Upon such review, we agree that in the absence of expert testimony to the contrary, Appellee's evidence failed to create a genuine issue of material fact as to Appellants' breach of a standard of care, and as a matter of law,

17

Appellants were correctly granted summary judgment. We, therefore, reverse the opinion of the Court of Appeals in this matter and reinstate the trial court's judgment dismissing Appellee's claims against Adams and Walkup.

All sitting. Minton, C.J.; Cunningham, Hughes, Keller, and VanMeter, JJ., concur. Wright, J., concurs in part and dissents in part by separate opinion.

WRIGHT, J., CONCURRING IN PART AND DISSENTING IN PART: While I otherwise concur with the majority, I respectfully dissent as to its holding concerning Dr. Adams. The majority insists that Appellee's claim against Dr. Adams required an expert witness to survive a motion for summary judgment. I disagree. We have accepted two circumstances under which expert testimony is unnecessary in medical cases such as this, pursuant to the doctrine of *res ipsa loquitur*. The first is "where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts." *Jarboe v. Harting*, 397 S.W.2d 775, 778 (Ky. 1965). The second exception to the need for expert testimony occurs by way of "admissions by the defendant doctor." *Id.* Both exceptions apply in the present case. Therefore, I would not place the onerous burden of securing an expert witness upon the Appellee— and would allow his claim against Dr. Adams to survive the motion for summary judgment.

Southern Health Partners (SHP) contracted with Hardin County to provide medical services to the inmates of the Hardin County Detention Center (HCDC). In turn, SHP contracted with Dr. Adams in April 2007 to provide

18

"professional medical services to inmates of" HCDC. In his contract with SHP, Dr. Adams agreed to provide these "professional medical services" at HCDC approximately five hours per week. Dr. Adams also agreed to "provide 24-hour continuous on-call physician coverage at [HCDC] when in town and available" and to "accept telephone calls from SHP personnel to evaluate medical problems and provide medical decisions . . . ." Dr. Adams testified during his deposition that he was HCDC's medical director and the primary care physician for its inmates.

In addition to his duties at HCDC, Dr. Adams maintained a family practice, oversaw a medical clinic, and contracted with SHP to be the primary physician for six other detention centers across the Commonwealth. Dr. Adams and Nurse Practitioner Walkup testified that Dr. Adams only visited HCDC once per month for one to two hours. Dr. Adams instead delegated the weekly visits required by the terms of his contract to Walkup. Walkup was tasked with visiting all seven jails for which Dr. Adams served as primary physician in two days each week—visiting three detention centers one day and four the other. Walkup saw patients in Dr. Adams's clinic the remainder of the week.

I will turn to the first exception where expert testimony is unnecessary in a medical case: "where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts." *Jarboe*, 397 S.W.2d at 778. Particularly relevant to this exception is SHP's "refusal of medical treatment" form, which was filled out each of the six times Appellee

19

refused his medication leading up to his eventual collapse and trip to the emergency room. The bottom of that form reads "SHP Medical Director's Acknowledgement (please initial)." Dr. Adams indicated in his deposition that he did not know why the form requires his signature; however, the reason is obvious. Just as Walkup testified, Dr. Adams's signature was necessary because he needed to be aware when patients refused medical treatment.

Shortly after signing the contract with SHP, Dr. Adams sent a signature stamp to HCDC. Walkup testified she told the nurses to utilize the stamp rather than obtaining the doctor's signature on "refusal of medical treatment" forms. Thus, the nurses stamped Dr. Adams's acknowledgement on the "refusal of medical treatment" document rather than ever discussing any refusal with the physician. (In fact, according to deposition testimony, the forms were often stamped in advance or simply photocopied with the signature already in place.) Dr. Adams had been the medical director and primary physician for HCDC for 3 years. Obviously, he had to implement and understand the impact of his procedures or lack thereof.

The very existence of this form and Dr. Adams's failure to have any knowledge of the information contained therein clearly demonstrated to the jury both the duty Dr. Adams owed his patients and the breach of that duty. Obviously, the refusal of medication form required the medical director's (Dr. Adams's) signature because it was important to the health and safety of the patient that he have the information. Dr. Adams's actions allowed the jury to "recognize or infer negligence" without the need of an expert witness.

20

Due to the use of the signature stamp—and much to Appellee's detriment—Dr. Adams remained unaware of Appellee's refusal to take his medication over the course of several days until Appellee was sent to the emergency room at a local hospital. An expert witness testified that the nurses were negligent in failing to contact Dr. Adams concerning Appellee's inability to take the prescribed medications. If it was negligent for the nurses to fail to inform Dr. Adams, it would have to be negligent for Dr. Adams to ignore that information on the six separate occasions his signature was affixed to the "refusal of medical treatment."

I will now turn to the second exception to the need for expert testimony involving "admissions by the defendant doctor." *Id.* During Dr. Adams's deposition testimony, he was questioned about what he would have done if he had actual knowledge that Appellee continued to vomit. Dr. Adams answered, "[i]f they would have called and said, that he is continuing to vomit . . . I would have said, send him to the ER." Through his signature stamp, Dr. Adams chose to ignore the vital information contained in the "refusal of medical treatment" documents. Had Dr. Adams not employed the use of the stamp in the manner in which he did, and had, instead, signed the documents himself or had a nurse discuss the patient with him within a reasonable time, Appellee's condition would not have deteriorated to the point it did before he was finally taken to the hospital. We know this through Dr. Adams's own testimony.

21

Eventually, Appellee was taken to the hospital, but only after he collapsed in his cell. The same day he was taken to the emergency room, Appellee was transferred to the University of Louisville Hospital, where they operated on him the following day. The emergency surgery would have occurred sooner, but Appellee was so dehydrated by this point that it had to be postponed to ensure he was properly hydrated. Appellee (who was thirty years of age at the time and had previously had several inches of his colon removed due to diverticulitis) suffered respiratory failure, requiring intubation, and had bilateral chest tubes placed after both of his lungs collapsed. Eventually, Appellee stabilized and had an exploratory laparotomy which revealed multiple small bowel adhesions, which were repaired.

It is true, as the majority points out, that Dr. Adams did not know Appellee had refused his medications, as the refusal of medical treatments were stamped with his signature and he chose not to read them or discuss them with the nurses. We have long held that the use of a signature stamp may constitute a signature. *Blackburn v. City of Paducah*, 441 S.W.2d 395, 397 (Ky. 1969) (internal citations omitted).

First, I readily acknowledge that there are many circumstances in which the use of a signature stamp would be perfectly acceptable. One example would be if Dr. Adams had given standing orders about circumstances which, if present, called for the use of the stamp. For instance, if he instructed the nurses when a patient refused an over-the-counter analgesic that they could simply stamp his name without contacting him, that would likely have been

22

appropriate. Likewise, had Dr. Adams told the nursing staff over the phone to stamp the refusal of medical treatment after being advised of the condition of the patient, Dr. Adams would have probably met his duty of care. In another scenario that would likely comport with Dr. Adams's duty, he could have authorized the use of the stamp for certain time intervals, and then had the nurses contact him with the details of the documents within a reasonable time. However, none of these things happened. Instead of a reasonable delegation with oversight, Dr. Adams signed the "refusal of medical treatment" and ignored the information contained therein.

Dr. Adams lacked knowledge of Appellee's refusal because he *chose* to cause the documents to be signed through the signature stamp without ever reading, reviewing, or discussing the information found in them. However, Dr. Adams's lack of actual knowledge did not remove his responsibility to Appellee's care. As we held in *Inquiry Comm'n v. Lococo*, 18 S.W.3d 341 (Ky. 2000), it amounted to gross negligence for an attorney to fail to oversee her employee's use of a signature stamp in the administration of an escrow account. If it is gross negligence for an attorney to fail to properly supervise the use of her signature stamp in the administration of mere money, how much more so would a doctor be grossly negligent in failing to properly supervise the use of his signature stamp in a matter of life and death?

Here, Dr. Adams failed to make any provision to ensure that he knew the information in the documents he signed. Appellee's sickness occurred more than three years after Dr. Adams became the primary care physician for the

23

inmates of HCDC and the nurses began using the signature stamp. As noted, there were many ways in which Dr. Adams could have had the nurses appropriately use the signature stamp. He just failed to use any of them or to set up any procedures regarding its use. He just chose not to do so. He testified that had he known the information contained in Appellee's "refusal of medical treatment," he would have taken immediate steps to treat Appellee's condition. However, it was through Dr. Adams's own procedures (or, rather, lack thereof) that he was unaware. As the old maxim goes, "ignorance of the law is no excuse"; neither is a doctor's willful ignorance of his patients' medical conditions.

Ultimately, Dr. Adams failed to follow the terms of his contract requiring him to act as the primary care physician for the HCDC inmates—and, more specifically, he failed to act as Appellee's primary care physician. It was his duty—and the duty was an important one. The doctor is responsible for the information in the document he signed even though he failed to read, discuss, or review it. Appropriate procedures and safeguards were established when the refusal of medical treatment form was established to require the medical director's signature. There had to be a reason that the form required the medical director's signature. By requiring that the "refusal of medical treatment" form require the medical director signature, the procedures and importance of the medical director having knowledge of this vital information were established. Once the procedure to make certain the medical director is informed of this vital information about the patient is established, why would

24

we need an expert to say it is negligent of Dr. Adams to not read or make certain he is aware of this vital information about his patient?

The stamp is the doctor's signature. It is his responsibility to specify how the stamp may be used and have checks and controls to make sure it is not being abused and he has all vital information. Medical mistakes in hospitals, clinics, prisons or jails can lead to injuries or even death. How can any hospital, clinic, prison or jail ever establish procedures to reduce this danger to patients if the doctor can avoid any responsibility by just saying I do not know what is in the paper I signed, my signature is just an administrative tool to keep the paper in the chart?

Dr. Adams's next excuse is that the nurses should have called him. I agree. The question we are faced with is whether the failure of the nurses to call the doctor totally excuses his failure to read, discuss or later review the document that he signed. Can the doctor avoid all responsibility by saying, "blame the nurses, I do not have any responsibility, even if I do not take the time or effort to read, discuss, or later review the documents that require my signature"?

Further, it is important to keep in mind the vulnerability of the population at issue here—the population Dr. Adams neglected. Appellee could not merely walk out of the jail to seek a second opinion. He could only seek treatment from the SHP nurses working at HCDC and could only depend on Dr. Adams—his primary care provider—to oversee that treatment. Dr. Adams failed to do so, and this failure almost cost Appellee his life.

25

When ruling on a motion for summary judgment, this court must view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). In looking through the lens of this standard, Appellee presented ample evidence to survive Dr. Adams's motion. Here, "the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts." *Jarboe*, 397 S.W.2d at 778. This is not a case where the jury would be required to look at complex medical evidence to determine whether Dr. Adams breached the standard of care; rather, the jury need only determine if Dr. Adams acted negligently through his willful ignorance of the severity of Appellee's condition. The jury could make this determination based on Dr. Adams' admissions. *Id.*

The facts of this case are such that a jury could have decided this case without expert opinion based on the doctrine of *res ipsa loquitur*. The facts are sufficient that a jury could find both negligence and causation based on three factors: (1) appropriate medical procedures required that the medical director (Dr. Adams) sign the "refusal of medical treatment" (this would've required that he was aware of the information in the "refusal of medical treatment" in a reasonable and timely fashion); (2) Dr. Adams signed the "refusal of medical treatment" without any provision or action to ensure that he knew the vital information contained therein in a reasonable and timely fashion; and (3) Dr. Adams admitted that if he had known the information in the "refusal of medical treatment," he would have ordered Appellee taken to the emergency room.

26

Therefore, I dissent as to the majority's holding regarding Dr. Adams and would remand this matter to the trial court with directions to deny Dr. Adams's motion for summary judgment.

COUNSEL FOR APPELLANTS:

Daniel Garland Brown
Robert Joseph Shilts
Gazak Brown, P.S.C.
3220 Office Pointe Place, Suite 200
Louisville, KY 40220

COUNSEL FOR APPELLEE:

Gregory Allen Belzley
Belzley Bathurst Attorneys
P.O. Box 278
Prospect, KY 40059

Daniel Jay Canon
Clay, Daniel, Walton, Adams, PLC
462 South Fourth Street
Meidinger Tower, Suite 101
Louisville, KY 40202