RENDERED: AUGUST 29, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-000276-DG

FINAL

DATE 9|24|19 JAT

ASHLAND HOSPITAL CORPORATION
D/B/A KING'S DAUGHTERS MEDICAL
CENTER                                                              APPELLANT


               ON REVIEW FROM COURT OF APPEALS
V.                   CASE NO. 2015-CA-001750-MR
               BOYD CIRCUIT COURT NO. 11-CI-01223


PAUL WESLEY LEWIS, M.D. AND DAVID                                   APPELLEES
SHACKELFORD

AND


2018-SC-000279-DG

PAUL WESLEY LEWIS, M.D.                                             APPELLANT


               ON REVIEW FROM COURT OF APPEALS
V.                   CASE NO. 2015-CA-001750-MR
               BOYD CIRCUIT COURT NO. 11-CI-01223


DAVID SHACKELFORD; AND                                             APPELLEES
ASHLAND HOSPITAL CORPORATION D/B/A
KING'S DAUGHTERS MEDICAL CENTER


**OPINION OF THE COURT BY JUSTICE KELLER**

**REVERSING AND REINSTATING**

The Boyd Circuit Court granted summary judgment in favor of Dr. Paul Wesley Lewis and Ashland Hospital Corporation d/b/a King's Daughters Medical Center ("KDMC") after finding that the complainant, David Shackelford, could not establish a prima facie case of negligence. More specifically, the trial court found that the proffered expert testimony failed to establish that any negligence on the part of the doctor or hospital was a substantial factor in causing injury to Shackelford. The Court of Appeals reversed, finding that expert testimony was not required to establish causation in this case. Dr. Lewis and KDMC then sought discretionary review, which this Court granted. Having reviewed the record and the applicable law, we now reverse the holding of the Court of Appeals and reinstate the Boyd Circuit Court's summary judgment order.

## I. BACKGROUND

In 2010, Shackelford's rheumatologist referred him to Dr. Lewis, an interventional radiologist, for a four-vessel cerebral angiogram to assist with diagnosing the cause of Shackelford's chronic headaches. Dr. Lewis performed the angiogram at KDMC on December 20, 2010. No complications arose during the procedure. Dr. Lewis then conducted a post-procedure assessment but did not note any concerns. Rather, Dr. Lewis noted, Shackelford "was normal conversant, no problems, no complaints, no weakness, no visual field changes."

2

Later, while in the post-op recovery room, Shackelford reported a frontal headache and scotoma, or spots in his field of vision.[1] The aforementioned symptoms may indicate a stroke but are also not uncommon after an angiogram.[2] A nurse reported these conditions to Dr. Lewis, who was performing another medical procedure at the time. He asked if any other problems had arisen, such as weakness, but the nurse reported that the spots were the only issue at that time. Dr. Lewis instructed the nurse to keep him informed of any changes. Later, after calling to check on Shackelford, Dr. Lewis was told that the scotoma had resolved, but Shackelford now had a headache. According to Dr. Lewis, he had no other visual changes, weakness, slurred speech, or facial palsies. Given Shackelford's history of headaches and the possibility that the angiogram triggered a migraine, Dr. Lewis prescribed pain medication. When nursing staff called Dr. Lewis later in the evening, they reported that the headache had improved.[3] Later, after hearing that the patient was feeling okay, Dr. Lewis discharged Shackelford, who then left KDMC at approximately 7:30 P.M.

Shackelford returned to KDMC the next morning via ambulance after becoming disoriented at his home. A CT scan was performed which appeared normal. An MRI was also performed which indicated multiple small infarcts scattered bilaterally or, in other words, signs of a recent stroke. Shackelford

---

[1] In his brief, Shackelford asserts that he complained of weakness in his legs. Dr. Lewis, in his deposition, states that he asked the nurse on at least two occasions if Shackelford had any weakness and was told that he did not.

[2] Dr. Lewis opined that about one-third of patients will see scotoma.

[3] Though it is somewhat unclear in the record, the headache may have increased in severity at some point and, as a result, Dr. Lewis prescribed Dilaudid, which in turn caused an upset stomach.

3

was then admitted to KDMC, where he was treated by a neurologist. He was discharged two days later. Though his condition has improved, he claims to have continuing short term memory loss and visual problems.

Shackelford initiated the underlying medical malpractice suit in Boyd Circuit Court. There is no allegation that the stroke itself was caused by negligence; rather, Shackelford alleges that the failure to examine and diagnose the stroke after the angiogram was negligent and caused injury greater than that which the stroke would have caused with earlier intervention. To support his claims, Shackelford identified one expert, Dr. Michael David Khoury, a vascular surgeon. During his discovery deposition,[4] Dr. Khoury criticized Dr. Lewis's failure to examine Shackelford when his symptoms were consistent with a stroke. However, Dr. Khoury did not opine that Dr. Lewis could have limited the effects of the stroke through earlier intervention. When asked specifically whether he could state within a reasonable degree of medical probability that Dr. Lewis's post-procedure care was a substantial factor in causing harm to Shackelford, Dr. Khoury responded that it was "impossible to tell."

Based largely upon Dr. Khoury's deposition testimony, Dr. Lewis and KDMC moved for summary judgment on the basis that the expert had failed to opine that the alleged negligence caused any injury to Shackelford, and, as a result, Shackelford could not prove an essential element of his medical malpractice claim. In response, the Boyd Circuit Court allowed Shackelford additional time to depose the defense experts, Drs. Peter J. Pema and Gregory

---

[4] Only portions of this deposition are included in the record.

Postal, both neuroradiologists. In his deposition, Dr. Pema acknowledged the general proposition that strokes require timely diagnosis and treatment but did not provide an opinion on causation under the specific facts of this case. Dr. Postal, on the other hand, opined that Shackelford began to present symptoms of a stroke *after* leaving the hospital.

After completion of the defense experts' depositions, the trial court entered an order granting KDMC's and Dr. Lewis's motions for summary judgment. That court acknowledged that Shackelford "elicited general testimony that strokes cause damage, that recognition of strokes needs to take place quickly, that treatment needs to be implemented quickly, and that damage can continue to occur following a stroke." However, the experts could not state with reasonable probability that, under the specific facts and circumstances of this case, the defendants' alleged negligence was a substantial factor in causing Shackelford's injuries. As a result, Shackelford could not "establish a prima facie case of negligence to overcome summary judgment," and his claims were dismissed.

On appeal, the Court of Appeals reversed. It found that, in this case, the issue of causation did not require expert medical testimony. It explained, "Given the ubiquity of information regarding stroke symptom identification and the necessity of prompt treatment, it has become common knowledge that 'time lost is brain lost' as to timely medical intervention." In other words, a jury of laymen with this general knowledge could resolve the causation issue without the aid of expert testimony. This Court granted discretionary review and now reverses the Court of Appeals' decision and reinstates the Boyd Circuit Court's summary judgment order.

5

## II. STANDARD OF REVIEW

As a threshold matter, we must address Dr. Lewis and KDMC's argument that the proper standard of review is abuse of discretion, rather than *de novo*. In making this argument, they rely heavily on *Blankenship v. Collier*, 302 S.W.3d 665 (Ky. 2010), but that case is easily distinguishable from the present matter. In *Blankenship*, the plaintiff did not dispute the necessity of an expert witness, yet he failed to disclose an expert despite receiving an extension of the discovery deadline. As a result, the defendants moved for summary judgment. The trial court granted the motion, noting that the plaintiff could not prove causation without an expert witness.

However, the issue reviewed for abuse of discretion was not the substance of the summary judgment ruling; rather, the issue was whether "the opposing party has been given ample opportunity to complete discovery." *Id.* at 668 (quoting *Pendleton Bros. Vending, Inc. v. Commonwealth, Fin. & Admin. Cabinet*, 758 S.W.2d 24, 29 (Ky. 1988)) (internal quotation marks omitted). If ample time had not been provided, it was inappropriate for the court to rule on the summary judgment motion. *Id.* As this Court explained,

> [E]ven though an appellate court *always* reviews the substance of a trial court's summary judgment ruling *de novo*, *i.e.*, to determine whether the record reflects a genuine issue of material fact, a reviewing court must also consider whether the trial court gave the party opposing the motion an ample opportunity to respond and complete discovery before the court entered its ruling.

*Id.* (emphasis added). In other words, "[t]he trial court's determination that a sufficient amount of time has passed and that it can properly take up the summary judgment motion for a ruling is reviewed for an abuse of discretion standard." *Id.*

6

In the present case, Shackelford produced an expert and was given additional time after the filing of the motion(s) for summary judgment to conduct discovery depositions of defense experts. The issue of whether he had an adequate amount of time to do so is not before this Court. The *substance* of the trial court's summary judgment ruling is before the Court, however. As *Blankenship* states, this issue is always reviewed *de novo.*

In this sense, the present matter is more akin to *Adams v. Sietsema,* 533 S.W.3d 172 (Ky. 2017). In *Adams,* the plaintiff brought a medical malpractice action and identified an expert, but the expert expressed no criticism of the defendants. The trial court granted summary judgment in the defendants' favor after concluding that the plaintiff could not succeed without an expert witness. The Court of Appeals reversed, finding expert opinion to be unnecessary. After this Court granted discretionary review, the appellants similarly argued that the matter should be reviewed for abuse of discretion, not *de novo.* More specifically, they categorized the trial court's decision as an evidentiary ruling, which is typically reviewed under an abuse of discretion standard. Our Court explained, however, that the appellants "confuse[] the *admissibility* of expert opinion evidence with an entirely different concept: the *sufficiency* of the evidence needed to sustain a claim of professional negligence." *Id.* at 178. In such cases, "the question is whether the plaintiff can possibly demonstrate without expert opinion testimony the existence of a genuine issue of material fact as to the defendant's breach of duty or causation of damages, and thereby refute the defendant's contrary assertion." *Id.*

To their credit, Dr. Lewis and KDMC concede that *Adams* may be applicable to this case, but they argue that the *de novo* standard of review

7

simply provides a distinction without a difference. True, under either standard, the reviewing court must consider whether the trial court made an error of the law. *Id.* at 176–77. As a result, the decision may be the same under either standard. *Id.* at 177. However, like the *Adams* court, we nevertheless find it necessary to clarify the applicable standard of review: A trial court's decision to grant summary judgment for insufficient evidence is to be reviewed *de novo* on appeal.

Thus, in this case, we must consider "whether the plaintiff can possibly demonstrate without expert opinion testimony the existence of a genuine issue of material fact as to the . . . causation of damages, and thereby refute the defendant's contrary assertion." *Id.* at 178. In reviewing this issue *de novo*, "any factual findings will be upheld if supported by substantial evidence and not clearly erroneous." *Id.* at 177. (quoting *Bd. of Regents of N. Ky. Univ. v. Weickgenannt*, 485 S.W.3d 299, 306–07 (Ky. 2016)) (internal quotation marks omitted).

### III. ANALYSIS

#### A. The *res ipsa loquitor* exception does not apply to this case.

As noted above, the question in this case centers on the *sufficiency* of the proof provided, specifically, the sufficiency of the proof of causation. Under established Kentucky law, proximate causation is a necessary element of a medical malpractice claim; the complainant must demonstrate that the medical professional's breach of the standard of care was a proximate cause of the complainant's injury. *See Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124

8

(Ky. 1991) (citations omitted). To be the proximate cause of the injury, the conduct in question must be a substantial factor in causing the injury. *See Bailey v. North American Refractories Co.*, 95 S.W.3d 868, 871 (Ky. App. 2001). Such proximate causation must be shown by a reasonable degree of medical probability, rather than mere possibility or speculation. *See Baylis*, 805 S.W.2d at 124; *Morris v. Hoffman*, 551 S.W.2d 8, 11 (Ky. App. 1977).

Typically, expert opinion evidence is required to establish causation in a medical malpractice suit. *See, e.g., Blankenship*, 302 S.W.3d at 670 (citation omitted); *Baylis*, 805 S.W.2d at 124 (citations omitted). As this Court recently explained in *Adams*,

> Most medical malpractice claims involve issues of science or professional skill outside the ordinary experiences and range of knowledge of typical jurors and judges. For that reason, most, but certainly not all, medical malpractice claims cannot be proven without expert opinion testimony to establish that the conduct in question departed from the applicable standard of care and was a proximate cause of the damages claimed.

533 S.W.3d at 179 (citations omitted). The expert testimony "provides information to assist the finder-of-fact, either a trial judge or jury, in determining whether the conduct in question violated the standard of care and caused the damages claimed by the plaintiff." *Id.*

However, Kentucky law recognizes two exceptions to the expert testimony requirement. In some cases, for example, the defendant physician "makes certain admissions that make his negligence apparent." *Blankenship*, 302 S.W.3d at 670. The other exception, *res ipsa loquitor*, arises in "cases in which the 'common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts.'" *Adams*, 533 S.W.3d 179

9

(quoting *Jarboe v. Hartin*, 397 S.W.2d 775, 778 (Ky. 1965)). In those cases, expert testimony is unnecessary because "the jury may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it." *Blankenship*, 302 S.W.3d at 670 (citation omitted). For example, Kentucky courts have found the *res ipsa loquitor* exception to apply when a dentist's drill slipped and punctured the patient's tongue, *Neal v. Wilmoth*, 342 S.W.2d 701 (Ky. App. 1961), and when a surgical hook was left inside a patient after surgery, *Nazar v. Branham*, 291 S.W.3d 599 (Ky. 2009). *See also Meiman v. Rehabilitation Ctr., Inc.*, 444 S.W.2d 78 (Ky. App. 1969) (finding *res ipsa loquitor* exception applicable where a bone was broken during physical therapy); *Jewish Hosp. Ass'n v. Lewis*, 442 S.W.2d 299 (Ky. App. 1969) (finding *res ipsa loquitor* exception applicable where extensive bleeding occurred after catherization procedure); *but see Green v. Owensboro Med. Health Sys., Inc.*, 231 S.W.3d 781 (Ky. App. 2007) (requiring expert testimony where plaintiff awoke from hand surgery with four loose, misaligned, and bloody teeth).

In the present case, the parties never contested that expert testimony was required. As a result, the trial court did not need to consider the necessity of such expert opinion evidence. *See Blankenship*, 302 S.W.3d at 673. Nevertheless, the Court of Appeals undertook that analysis and determined that expert testimony was *not* required. Although that court did not name the *res ipsa loquitor* exception, it clearly adopts it. For example, the Court of Appeals explains, "Given the ubiquity of information regarding stroke symptom identification and the necessity of prompt treatment it has become common knowledge that 'time lost is brain lost' as to timely medical intervention."

10

We disagree with the Court of Appeals' analysis. Although public service campaigns have increased public awareness and knowledge about stroke symptoms and timely intervention, that general information cannot provide the medical expertise necessary to evaluate this particular claim of medical malpractice. In other words, the question is not simply whether "time lost is brain lost." Rather, the specific facts and circumstances of this case play a significant role in determining whether the alleged negligent conduct was a substantial factor in Shackelford's injuries, and to what extent. For example, as Dr. Lewis's deposition testimony illustrates, a variety of factors influenced his diagnosis and treatment of Shackelford, including Shackelford's medical history and history of cluster headaches; the common side effects of the angiogram procedure, including headache and scotoma; and the manner in which Shackelford's headache and scotoma presented, as well as their timing. The complexities of these factors and how they affected Dr. Lewis's evaluation of Shackelford may have also influenced the severity of the injury. These matters are clearly relevant to the determination of an alleged breach of the standard of care. Despite public perception about timely intervention, the average layperson cannot properly weigh such complex medical evidence without the aid of expert opinion. We therefore conclude that expert testimony is necessary to show that Dr. Lewis and KDMC's alleged breach of the standard of care was a substantial factor in causing any harm to Shackelford.

To conclude otherwise is to drastically expand the *res ipsa loquitor* exception and to virtually eliminate the need for expert opinion evidence in similar medical malpractice actions that involve common or highly publicized conditions (e.g., stroke, heart attack, and even some cancers). This ignores

11

Kentucky's long-standing practice of requiring expert opinion evidence in medical malpractice actions to assist the finder-of-fact in understanding matters "of science or professional skill outside the ordinary experiences and range of knowledge of typical jurors and judges." *Adams*, 533 S.W.3d at 179. For this reason and the reasons stated above, we find that the Court of Appeals erred in applying the *res ipsa loquitor* exception to this case.

### B. The proffered expert opinion evidence failed to raise a genuine issue of material fact on the issue of causation.

Having determined that expert testimony was necessary in this case, we must next consider whether the expert opinion evidence in this matter was sufficient to raise a genuine issue of material fact. The Court of Appeals briefly addressed this point in its opinion. It stated, "Even if we had concluded that these facts required expert medical evidence, the deposition testimony of defense expert, Dr. Pema, also reached the issue of causation." No further analysis was given.

Dr. Pema's deposition testimony touches on the general proposition that strokes require timely intervention. He acknowledged that "time lost is brain lost" and "lost brain cells don't regenerate," for example. However, Dr. Pema's statements do not reach the issue of causation *under the facts of this particular case.* In fact, when Dr. Pema was asked about this case specifically, he could not opine that Shackelford's injuries were caused by the failure to timely intervene. For example, when asked during his deposition[5] whether Shackelford's discharge from KDMC caused damage, assuming he was released while suffering a stroke, Dr. Pema responded, "I don't know that you can say

---

[5] Portions of Dr. Pema's deposition are included in the record.

from the time after he was released to the time he came back that any difference would have been made. The damage could have been done and there may have been no treatment for it."

As the trial court explained, the experts in this case acknowledge the general proposition that strokes cause damage and should be diagnosed and treated as quickly as possible. However, while it is generally true that "time lost is brain lost," the causation element of this claim must be analyzed under the facts and circumstances of this particular case. Simply put, an expert cannot speculate based on general, simplified information regarding diagnosis and treatment. Here, when the expert witnesses were asked to consider the specifics of this case, they were unable to state with a reasonable degree of medical probability that the conduct of either Dr. Lewis or KDMC was a substantial factor in causing Shackelford's injuries. We therefore conclude that Shackelford failed to present the expert opinion evidence necessary to demonstrate causation. Accordingly, because there was no genuine issue of material fact, Dr. Lewis and KDMC were entitled to judgment as a matter of law.

**IV. CONCLUSION**

For the reasons set forth above, we conclude that the trial court's decision to grant summary judgment based upon a failure of proof of causation is subject to a *de novo* review. Having reviewed this matter *de novo*, we conclude that the *res ipsa loquitor* exception is inapplicable herein and expert opinion evidence is therefore required to establish causation. The expert testimony in this case failed to raise a genuine issue of material fact as to the causation element, and Dr. Lewis and KDMC were therefore entitled to

13.

summary judgment as a matter of law.  Accordingly, we reverse the decision of the Court of Appeals and reinstate the trial court's order granting summary judgment and dismissing the claims against Dr. Lewis and KDMC.

Minton, C.J; Buckingham, Hughes, Keller, VanMeter and Wright, JJ., sitting.  All concur.  Lambert, J., not sitting.

COUNSEL FOR ASHLAND HOSPITAL CORPORATION D/B/A KING'S DAUGHTERS MEDICAL CENTER:

William Mitchell Hall, Jr.
Keri E. Hieneman
Alexis Orlando Gonzalez-Lopez
VanAntwerp Attorneys, LLP


COUNSEL FOR PAUL WESLEY LEWIS, M.D.:

Kenneth Williams, Jr.
David Frederick Latherow
Geoffrey D. Marsh
Williams, Hall & Latherow, LLP


COUNSEL FOR APPELLEE, DAVID SHACKELFORD:

Anthony David Blankenship
Kinner & Patton


COUNSEL FOR AMICUS CURIAE, KENTUCKY DEFENSE COUNSEL, INC.:

Melissa Thompson Richardson
Elizabeth Bass
Laura Katharine Haagen
Walters Meadows Richardson PLLC


COUNSEL FOR AMICUS CURIAE, AMERICAN MEDICAL ASSOCIATION AND KENTUCKY MEDICAL ASSOCIATION:

Bethany A. Breetz
Sarah Spurlock
Stites & Harbison, PLLC

Phillip Seth Goldberg
Cary Silverman
Shook, Hardy & Bacon, LLP