RENDERED: APRIL 14, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1175-MR

TAYLOR GIPSON             APPELLANT

        APPEAL FROM CALLOWAY CIRCUIT COURT
v.       HONORABLE JOHN L. ATKINS, SPECIAL JUDGE
         ACTION NO. 13-CI-00462

LORAINE ELIZABETH COOK AND
CHARLES EUGENE COOK, JR., CO-EXECUTRIX/
EXECUTOR OF THE ESTATE OF CHARLES
EUGENE COOK, M.D., DECEASED;
ELLEN M. BURNETT, M.D.;
MURRAY WOMAN'S CLINIC, PLLC, A/K/A
MURRAY WOMAN'S CLINIC, PLLC F/K/A
MURRAY WOMAN'S CLINIC, P.S.C.;
AND MURRAY-CALLOWAY COUNTY
PUBLIC HOSPITAL CORP., d/b/a
MURRAY-CALLOWAY COUNTY
HOSPITAL              APPELLEES

<u>OPINION</u>
<u>AFFIRMING</u>

** ** ** ** **

BEFORE: EASTON, ECKERLE, AND GOODWINE, JUDGES.

EASTON, JUDGE: Taylor Gipson ("Gipson") appeals the Calloway Circuit Court's summary judgment dismissing the medical negligence claims she asserted against the appellees, stemming from the circumstances of a miscarriage she suffered in 2012. Upon review of this tragic case, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

The material facts in this matter are not in dispute. On November 13, 2012, Taylor Gipson presented to the emergency department at Murray-Calloway County Hospital ("MCCH") with complaints of contractions and pressure in her pelvis. At the time, Gipson was pregnant and at 21-and-5/7[1] weeks gestation. It is important at the outset to recognize that all experts agree the child born, a boy named Xaedyn, could not have survived from the moment Gipson arrived at MCCH, no matter what any medical provider had done.

Dr. Charles Cook[2] was the on-call obstetrician. As set forth in his progress notes, Dr. Cook examined Gipson around 7 p.m. and reported that the baby was "at least partially in the vagina with a cord prolapse without visible pulsation." Dr. Cook also reported in his progress notes that he explained to Gipson – along with her parents, Kimberly and Kristopher Gipson, who were with

---

[1] Some evidence of record, referenced in this Opinion, also indicates Gipson was at 21-and-6/7 weeks gestation. For our purposes, this distinction is irrelevant.

[2] Dr. Charles Cook died during the pendency of this appeal. As the caption of this Opinion indicates, his estate and its representatives were substituted as appellees in his stead.

her at the time – that "delivery is inevitable and [the] fetus by all evidence is not living." Understanding that she was in labor, that there was no way to stop it, and that her baby was probably already dead, Gipson consented to a vaginal delivery. At around 7:40 p.m., Dr. Cook noted the baby had begun to descend further and that the cord was prolapsed. This was Dr. Cook's only involvement in Gipson's care that evening.

Dr. Ellen Burnett, another obstetrician, took over Gipson's care at or about 8 p.m. At 9:50 p.m., Dr. Burnett examined Gipson and noted the baby was low in the vaginal vault and there was no bleeding. She documented that Gipson was tearful when asked if she wanted to see the baby after the delivery. Gipson stated that she would decide after the baby was born. At 1:30 a.m. on November 14, 2012, Dr. Burnett's examination revealed that the baby had not progressed much and was still in the vaginal vault. Upon Dr. Burnett's suggestion, Gipson agreed to augment and expedite the progress of her labor with Cytotec, a utero-tonic drug.

Xaedyn was delivered at 4:02 a.m. He was born with a heartbeat, but his eyes were fused and his lungs fatally underdeveloped. He had a heart rate of less than 100 bpm,[3] and an APGAR[4] score of 2. Observations support the

---

[3] Beats per minute.

conclusion the amniotic sac had ruptured at least eight weeks earlier.  At or immediately after the time when Xaedyn was delivered, Gipson's blood began pooling on her chux[5] pads, her pulse increased to 150, her blood pressure dropped to 78/60, and she reported being lightheaded.  Dr. Burnett's progress note at 4:50 a.m. states:

> Pt rested and remained comfortable through night.  Baby delivered at 04:02. + FHT [positive fetal heart tones]. Baby to warmer.  Eyes fused.  Pts parents at her side. Blood was pooling at pads.  Pts pulse increased to 150 and BP dropped to 78/60.  Pt reported feeling lightheaded.  Blood was obtained and infusion started. Anesthesia at bedside as well.  Pt stable.  No further bleeding.  But placenta not yet delivered.

Gipson was closely monitored and began receiving two units of blood at 4:20 a.m.  The infusion was completed at 5:30 a.m.  While Gipson was receiving the infusion, the baby's heart stopped.  His time of death was 4:50 a.m.  Xaedyn had lived for 48 minutes.  At 5:50 a.m., Gipson was with Xaedyn.  Dr. Burnett's progress notes provide:

> No further bleeding.  Placenta still undelivered.  Pt with baby now.  Pt and family understand that there is no need for OR procedure for placenta right now unless bleeding restarts.  Time of fetal heart stopping was 04:50A.

---

[4] Named for Dr. Virginia Apgar, the APGAR score is an acronym standing for Appearance, Pulse, Grimace, Activity, and Respiration. The highest score is a ten.

[5] A chux pad is a form of disposable underpads used in hospitals to collect bodily fluids such as blood.  The name is believed to have derived from the fact such pads are "chucked" into the trash after use.

Xaedyn's body was taken to the nursery at 6:27 a.m. Gipson had a retained placenta, which needed to be removed. At 6:50 a.m., Dr. Burnett checked on Gipson and reported in her progress notes: "No further bleeding but pt anxious about placenta and wants it 'over.' OR crew aware. Cytotec was placed but no results so far." At 7:55 a.m., Gipson was taken to surgery to remove her retained placenta.

Dr. Burnett reported in her progress notes that later that day, near 1 p.m., she spoke with Gipson and her family to review Gipson's delivery course; Gipson was aware that the baby she had delivered had a heartbeat, but that the baby's lungs were not developed to support life; and Gipson understood they had not previously discussed the baby's condition at birth due to Gipson's hemorrhage and need for emergency medical intervention.

Gipson, on the other hand, denies she had any such conversation with Dr. Burnett prior to her discharge that day. Gipson's mother, Kimberly, also testified that they did not discover the baby had been born alive until the day afterward, when the funeral director informed them of that fact after confirming it over the telephone with the hospital.

On November 12, 2013, Gipson filed civil claims in Calloway Circuit Court against MCCH; Dr. Cook; Dr. Burnett; and Murray Woman's Clinic, PLLC, ("Murray Woman's Clinic") the entity that employed Drs. Cook and Burnett. The

nature and substance of Gipson's claims against these individuals, as well as additional relevant facts, will be discussed below in our analysis.

During the years of this litigation, now into its tenth year, the record amassed totaled ten volumes of over 1,500 pages, many of which were unnecessary repeat copies of the at least seventeen depositions in the record. After thorough briefing and an oral argument in July 2021, the circuit court granted summary judgment dismissing all Gipson's claims. This appeal followed.

## ANALYSIS

Gipson makes two overarching contentions of error on appeal: first, the circuit court erred in dismissing claims she asserted against the appellees for "intentional or reckless infliction of emotional distress"; and second, that it erred in dismissing claims she asserted against the appellees for medical negligence.

**Gipson's "intentional or reckless infliction of emotional distress" claims**

In violation of our civil rules, Gipson fails to indicate where, and in what manner, she preserved any arguments below relating to "intentional or reckless infliction of emotional distress."[6] We reviewed this entire record, and

---

[6] Kentucky Rule of Civil Procedure ("CR") 76.12(4)(c)(v) was in effect at the time appellate briefs in this case were filed, and the rule required Gipson's brief to "contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." A nearly identical provision about requiring preservation statements is contained in the new Kentucky Rules of Appellate Procedure ("RAP") effective January 1, 2023. *See* RAP 32(A)(4) (An appellant brief "shall contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner.").

Gipson asserted no such claims. Gipson specified her causes of action in

paragraphs 18 through 20 of her unamended complaint. There, she alleged:

> 18. During his care and treatment of Plaintiff, Taylor Gipson and her unborn child, during their admission to Murray-Calloway County Hospital beginning on November 13, 2012, the Defendant, Charles Eugene Cook, M.D., acted *negligently* and failed to exercise the degree of care and skill that is expected of reasonably competent and prudent obstetrician [sic] acting under the same or similar circumstances, including but not limited to failing to order an ultrasound to confirm the diagnosis of an intrauterine fetal demise, and such *negligence* was a substantial factor in causing the Plaintiff, Taylor Gipson, to suffer from and to continue to suffer from severe emotional injury and distress which has significantly affected her life requiring ongoing treatment and counseling and expenses for the same.

> 19. During her care and treatment of the Plaintiff, Taylor Gipson, and her unborn son, during their admission to Murray-Calloway County Hospital on November 13th and 14th of 2012, the Defendant, Ellen M. Burnett, M.D., acted *negligently* and failed to exercise the degree of care and skill that is expected of reasonably competent and prudent obstetrician [sic] acting under the same or similar circumstances, including but not limited to failing to order an ultrasound to confirm the diagnosis of an intrauterine fetal demise, failing to monitor or otherwise evaluate for fetal status, failing to intervene on behalf of the fetus, including transferring mother and baby to another facility, failing to have a pediatrician in attendance to resuscitate the baby, and inducing the premature delivery of the baby with a utero-tonic drug, and such *negligence* was a substantial factor in causing the Plaintiff, Taylor Gipson, to suffer from and to continue to suffer from severe emotional injury and distress which has significantly affected her life requiring

ongoing treatment and counseling and expenses for the same.

20.  During Taylor Gipson's admission to Murray-Calloway County Public Hospital Corporation from November 13, 2012 through November 14, 2012, the Defendant Hospital, acting by and through its agents and/or employees, acted *negligently* and failed to exercise the degree of care and skill ordinarily expected of a reasonable and prudent hospital acting under the same or similar circumstances, and such *negligence* was substantial factor [sic] in causing the Plaintiff, Taylor Gipson, to suffer from and to continue to suffer from severe emotional injury and distress which has significantly affected her life requiring ongoing treatment and counseling and expenses for the same.

(Emphasis added.)

A plaintiff may not assert new causes of action during the pendency of the proceeding which were not set out in the complaint unless they are tried by the express or implied consent of the opposing party. *See generally* CR 15.02; *Traylor Bros., Inc. v. Pound*, 338 S.W.2d 687 (Ky. 1960).  Moreover, "[w]hen an issue has not been addressed in the order on appeal, there is nothing for us to review.  Our jurisprudence will not permit an appellant to feed one kettle of fish to the trial judge and another to the appellate court." *Owens v. Commonwealth*, 512 S.W.3d 1, 15 (Ky. App. 2017) (citations and footnote omitted).

Here, as set forth above, Gipson asserted only claims of medical negligence in her complaint.  Those were also the only claims that were adjudicated below.  Indeed, Gipson's first mention of any claims of "intentional or

-8-

reckless infliction of emotional distress" in this proceeding appears to be on page 10 of her appellate brief – notwithstanding the fact that she prefaced page 1 of the same brief with the following statement: "*This is a medical negligence action* filed by Plaintiff, Taylor Gipson, seeking to recover damages for the severe emotional injury and distress she suffered related to the circumstances surrounding the death of her son . . . shortly after his birth." (Emphasis added.)

In short, Gipson's newly raised claims of "intentional or reckless infliction of emotional distress" are not proper subjects of appellate review, and we must disregard any arguments she now makes pertaining to them. Having failed to raise any such claims below, Gipson has deprived this Court of any authority to address them now. *Regional Jail Authority v. Tackett*, 770 S.W.2d 225 (Ky. 1989). We note such a claim would not have been sustainable in these circumstances. *See Humana of Kentucky v. Seitz*, 796 S.W.2d 1 (Ky. 1990).

**Gipson's medical negligence claims**

Gipson's remaining contentions take issue with the circuit court's summary dismissal of the medical negligence claims she asserted against the various appellees. Before delving into the specifics of her contentions, we turn to our applicable standard of review:

> "The standard of review on appeal of a summary judgment is whether the circuit judge correctly found that there were no issues as to any material fact and that the moving party was entitled to a judgment as a matter of

law." *Pearson ex rel. Trent v. Nat'l Feeding Systems, Inc.*, 90 S.W.3d 46, 49 (Ky. 2002). Summary judgment is only proper when "it would be impossible for the respondent to produce any evidence at the trial warranting a judgment in his favor." *Steelvest, Inc., v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). In *Steelvest*, the word "'impossible' is used in a practical sense, not in an absolute sense." *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992). In ruling on a motion for summary judgment, the court is required to construe the record "in a light most favorable to the party opposing the motion . . . and all doubts are to be resolved in his favor." *Steelvest*, 807 S.W.2d at 480. A party opposing a summary judgment motion cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Id*. at 481.

*Ryan v. Fast Lane, Inc.*, 360 S.W.3d 787, 789-90 (Ky. App. 2012).

"Appellate review of a summary judgment involves only legal questions and a determination of whether a disputed material issue of fact exists. So, we operate under a de novo standard of review . . . ." *Adams v. Sietsema*, 533 S.W.3d 172, 177 (Ky. 2017) (quoting *Shelton v. Ky. Easter Seals Soc'y, Inc.*, 413 S.W.3d 901, 905 (Ky. 2013)).

*Phelps v. Bluegrass Hospitality Mgt., LLC*, 630 S.W.3d 623, 627 (Ky. 2021).

As for the law applicable to each of Gipson's claims, a common law negligence claim requires proof of: (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury. *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012). Due to the complexity of medical

-10-

procedures, proof of these elements, almost always, must take the form of expert testimony. *Johnson v. Vaughn*, 370 S.W.2d 591, 596 (Ky. 1963) (explaining a physician's negligence must generally be established by expert medical testimony); *Baptist Healthcare Systems, Inc. v. Miller*, 177 S.W.3d 676, 680-81 (Ky. 2005). That is, only expert testimony can establish for the jury "the applicable medical standard of care, any breach of that standard and the resulting injury." *Blankenship v. Collier*, 302 S.W.3d 665, 675 (Ky. 2010).[7] That quotation embraces each of the four elements of a medical negligence claim. It logically follows, then, that "[t]o survive a motion for summary judgment in a medical malpractice case in which a medical expert is required, the plaintiff must produce expert evidence or summary judgment is proper." *Andrew v. Begley*, 203 S.W.3d 165, 170, 173 (Ky. App. 2006).

### Gipson's negligence claim against MCCH

In its motion for summary judgment, MCCH argued dismissal of Gipson's claim against it was warranted because, in its view, Gipson had failed to adduce expert evidence supporting that it or any of its agents had: (1) deviated from any applicable standard of care; or (2) caused or contributed to any of

---

[7] Of course, "[e]xpert testimony is not required . . . in *res ipsa loquitur* cases, where the jury may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it, and in cases where the defendant physician makes certain admissions that make his negligence apparent." *Love v. Walker*, 423 S.W.3d 751, 756 (Ky. 2014) (internal quotation marks and citations omitted).

Gipson's alleged damages. In its order summarily dismissing Gipson's medical negligence claim against MCCH, the circuit court, without elaboration,[8] ultimately cited this latter basis as dispositive. Gipson now appeals, but in doing so largely ignores the former basis of MCCH's motion.

We agree with the circuit court's ultimate judgment. However, because we find the former basis of MCCH's motion more compelling, we affirm on that basis as well. *See Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 575-76 (Ky. 2009) ("[A]n appellate court may affirm a lower court's decision on other grounds as long as the lower court reached the correct result.").

In Paragraph 20 of her complaint, Gipson did not specify *how* MCCH acted negligently toward her. She also made no allegation in her complaint – nor does she make any argument on appeal – that the other appellees qualified as MCCH's agents, or that MCCH was otherwise vicariously liable for any other appellee's conduct.[9] With that in mind, the only medical evidence Gipson adduced below regarding MCCH's applicable standard of care and alleged breach thereof

---

[8] We do not fault the circuit court for including little to no elaboration in its summary judgment orders. For purposes of CR 56, findings of fact and conclusions of law – while often helpful to this Court – are generally not required. *See* CR 52.01.

[9] Relevant to this point, Gipson specified in Paragraphs 4 and 5 of her complaint that Cook and Burnett were both "a principal, member, shareholder, employee, and/or agent, actually, ostensibly or otherwise of the Defendant Murray Woman's Clinc [sic], PLLC a/k/a Murray Woman's Clinic, PLLC, and such Defendant is jointly and severally liable with" them. Gipson made no such representations of agency or vicarious liability in her complaint regarding MCCH.

-12-

derived from the deposition testimony of her medical expert, Mark B. Landon,

M.D.  In relevant part, Dr. Landon testified:

> COUNSEL:  All I really want to do in the short time I question you today is to find out each and every criticism you level against the hospital and its nursing staff.  When I read your disclosure, it states you're expected to testify that *the nursing staff at Murray-Calloway County Hospital violated accepted standards of care by failing to question the labor management plan, including the order for Cytotec to augment labor without a diagnostic ultrasound performed to confirm the presumptive diagnosis of intrauterine fetal demise.  Is that the extent of your opinions concerning the hospital and its nurses*?
>
> LANDON:  *Right*.
>
> COUNSEL:  Anything else you want to add to that statement while we're here today?
>
> LANDON:  Not in terms of standard of care.
>
> COUNSEL:  Okay.  What exactly and which nurse specifically did you expect to question the labor management plan?
>
> LANDON:  Right.  So that would – I'm not good on the names, but that would be the bedside nurse at the time that Dr. Cook made a presumptive diagnosis of fetal demise or his assumed diagnosis of fetal demise, and then the nurse in the middle of the night.
>
> COUNSEL:  That would have been Brandy Schiller; correct, Doctor?
>
> LANDON:  Thank you.  When Dr. Burnett decided to augment with Cytotec after many hours had gone by without delivery.

COUNSEL:  Okay.  *We can agree, between you and I, that the diagnosis of intrauterine fetal demise is not a nursing function; correct*?

LANDON:  *Correct.*

COUNSEL:  *We can also agree, can we not, that augmentation of labor with Cytotec is not a nursing decision; correct*?

LANDON:  As a general statement, that's true. However, *if the nurses believe that a fetus is alive potentially, then they can call into question* whether you want to augment the delivery or not and involve the woman in that decision, simply.

COUNSEL:  All right.  To follow up with that, what evidence did any nurse, especially Brandy Schiller – because I think we've established that's who the bedside nurse would have been at that time when the Cytotec was started.  What evidence did she have that indicated that the fetus was alive?

LANDON:  She – to my best knowledge, the only knowledge – the only thing she would have known regarding that very issue was, again, that there was a speculum exam performed that showed, quote/unquote, no pulsation in the umbilical cord.

COUNSEL:  Okay.  And that would be an indicator of fetal demise; correct?

LANDON:  Well, it could be.  And we've discussed, and I think I'm on the record as saying, that that's an inadequate means by which to diagnose a fetal demise in a 21 plus week gestation.

COUNSEL:  Okay.  And it's –

LANDON: I mean, all you'd have – all I'd have to do is show folks the size of the umbilical cord at 21 weeks, and it's sitting in the vagina in the dark speculum and, you know, exam and how somebody is going to look at that and know if that's beating or not escapes me.

COUNSEL: Okay. But just to be clear, the speculum exam was not performed by one of the nurses at Murray-Calloway County Hospital that we're talking about; correct?

LANDON: Correct. But I think one of the nurses has testimony that she observed as well as Dr. Cook.

COUNSEL: Okay. But she's not – she's observing Dr. Cook perform the speculum exam; correct? That's what the testimony –

LANDON: We'd have to go back and look at her testimony as to whether that is it or whether she independently thought she could look at the cord and tell whether it was pulsating or not.

COUNSEL: *Could the nurses at Murray-Calloway County Hospital have ordered the ultrasound, whether it was transvaginal or transabdominal*?

LANDON: *I don't think so*.

COUNSEL: *Could they have – could they have ordered any other testing to have determined whether there was intrauterine fetal demise or whether it was a live fetus*?

LANDON: *I don't think they order tests*. I think they can suggest to the physician, quote/unquote, don't you think we should get an ultrasound and be sure this baby is not alive –

COUNSEL: Okay.

LANDON: – because it might make a difference in what we do here.

COUNSEL: Okay. As you were being questioned, both – by both the other counsel, you mentioned that your criticisms was [sic] relative to the diagnosis and the management. And *can we agree that the diagnosis is not a nursing function; correct*?

LANDON: I think, *ultimately, physicians make the diagnosis*. But I think – I believe that, too, how – nurses can help them along arriving at a diagnosis, or ruling out a diagnosis, for that matter.

(Emphasis added.)

In other words, Dr. Landon believed MCCH was negligent because its employee, Nurse Schiller, failed to "question the labor management plan, including the order for Cytotec to augment labor without a diagnostic ultrasound performed to confirm the presumptive diagnosis of intrauterine fetal demise." In that vein, he opined that if Schiller, as a nurse, "believe[d]" that the "fetus was alive potentially," she could have "call[ed] into question whether you want to augment the delivery or not and involve the woman in that decision." He indicated, however, that if Schiller had made any such statement to the doctor she was assisting, it would have at most only been a non-binding suggestion because: (1) diagnosing intrauterine fetal demise is the function of a doctor, not a nurse; (2) augmentation of labor with Cytotec is also not a nursing decision; and (3) as a

-16-

nurse, Schiller had no authority to order an ultrasound or any other test regardless of whether she disagreed with the doctor she was assisting.

As discussed, it was Gipson's obligation for summary judgment purposes to present expert testimony establishing the applicable medical standard of care and any breach of that standard. *See Blankenship*, 302 S.W.3d at 675. Furthermore, Gipson could not defeat MCCH's properly supported motion for summary judgment by simply hoping that a trier of fact might disbelieve the movant's denial of a disputed fact; rather, she was required to produce affirmative evidence. *See Ryan*, 360 S.W.3d at 790.

With that in mind, we are unwilling to hold that a breach of the "duty" Dr. Landon outlined in his testimony could be legally actionable. From his description of it, this "duty" merely obligated Schiller to make a non-binding suggestion regarding matters outside the scope of her duties and authority. Moreover, even if Schiller had a duty to make that type of suggestion, no evidence indicates her duty was triggered. Recall, Dr. Landon testified that Schiller, as a nurse, could make this suggestion if she *"*believe[d]" that the baby was "alive potentially." However, Schiller has never made any representation that, prior to its delivery, she *believed* the baby was alive or potentially alive. To the contrary, in her deposition Schiller testified that after Dr. Cook examined Gipson and made the determination that there were no signs that the baby was alive, the operative

-17-

assumption going forward was that the baby was not living;[10] that she consequently

canceled various procedures that would have been necessary if it had been

anticipated that the baby would be born alive;[11] and that when the baby was

ultimately born alive, it *surprised* her.[12]

---

[10] To this effect, Schiller testified:

> SCHILLER:  We had not seen the cord pulsing which would suggest – not to mention the fact that there was no heartbeat when we placed [Gipson] back on the monitor after.
> COUNSEL:  Okay, all right.  That's – that's – that helps me.
> SCHILLER:  Okay.
> COUNSEL:  After that point, was there anything else done to determine whether the baby was alive?
> SCHILLER:  Not that I can recall.
> COUNSEL:  And you didn't note anything else done?
> SCHILLER:  No.
> COUNSEL:  From that point forward – we've gone through your notes.  From that point forward it was – at least the assumption was that the baby was not living?
> SCHILLER:  Correct.

[11] To this effect, Schiller testified:

> SCHILLER:  I cancelled the Apgar score assessment for the infant, cancelled the L and D discharge transfer assessment, completed the notify physician, two different notify physicians that we have on ours, canceled kangaroo care, labor and delivery oxygen, airway charges, teaching record, and the 24-hour chart check.
> COUNSEL:  So at this time, you're – you're operating under the, I'm not going to say assumption, but the belief is that the baby is going to be stillborn, correct?
> SCHILLER:  Correct.
> COUNSEL:  That's why all of this has been cancelled, transfer, Apgar scoring, all of that was – had been cancelled?
> SCHILLER:  Correct.

[12] To this effect, Schiller testified:

> COUNSEL:  Were you surprised when the baby was delivered alive and when you placed the baby in the warmer the baby was showing signs of life –
> . . .

-18-

As an essential element of her negligence claim against MCCH, Gipson was required to demonstrate MCCH deviated from an applicable standard of care. Gipson failed to do so. Accordingly, the circuit court committed no error in granting summary judgment on Gipson's claim against MCCH.

### Gipson's medical negligence claims against Drs. Burnett and Cook and Murray Woman's Clinic

Gipson appeals the circuit court's summary dismissal of the medical negligence claims she asserted directly against Drs. Burnett and Cook, and vicariously against Murray Woman's Clinic. In their respective motions for summary judgment, these appellees argued dismissal of Gipson's claims was warranted because, in their view:

(1) Gipson produced insufficient evidence demonstrating Drs. Burnett and Cook violated the applicable standard of care for determining whether, prior to inducing Gipson's premature delivery, her baby had a heartbeat;

(2) Gipson's claims took issue with alleged failures to take several measures (including but not limited to detecting a fetal heartbeat) which undisputedly would not have prevented Gipson from

---

COUNSEL:  – with a heartbeat and with reflexes?
. . .
SCHILLER:  Yes.
COUNSEL:  And why were you surprised?
SCHILLER:  Because we had not found a heartbeat earlier in the evening.

-19-

miscarrying and losing her baby, and the evidence did not otherwise clearly link any of Gipson's alleged emotional distress with any actionable medical negligence; and

(3) Gipson had asserted a "purely emotional injury." The appellees reasoned such an "injury" could not be compensable because Gipson failed to adduce admissible "expert" evidence of "severe emotional distress" as mandated in *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012).

The circuit court granted these appellees' motions with little elaboration, but in any event "it will be assumed that it was upon any or all of the grounds which the proof sufficiently established." *Sword v. Scott*, 169 S.W.2d 825, 827 (Ky. 1943). The dispositive issue, for purposes of our review, is their second ground.

With respect to the first ground, we need not analyze the conflicting expert evidence about breach of standard of care by these doctors in the failure to determine Xaedyn had a heartbeat, although he still was not viable. For the third ground, even if Gipson was not required to present expert evidence of her emotional distress in the context of this case, she was nevertheless required to present proof of emotional distress that is "clear and satisfactory. . . . [E]vidence based on conjecture will not support a recovery for such damages." The jury must

be able to "infer that anxiety or mental anguish in fact occurred." *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1997) (cited with approval in *Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 39 (Ky. 2017). We choose not to analyze the emotional upset Gipson no doubt suffered.

To determine whether summary judgement was properly granted, we must therefore determine only whether Gipson marshaled sufficient evidence to demonstrate at trial that she suffered emotional injuries, to a "clear and satisfactory" degree, attributable to or **caused by** what could be found to have been the appellees' **actionable** negligence. Upon review, we find she failed to do so.

For purposes of framing our analysis, we return to the relevant allegations of Gipson's complaint:

18. During his care and treatment of Plaintiff, Taylor Gipson and her unborn child, during their admission to Murray-Calloway County Hospital beginning on November 13, 2012, the Defendant, Charles Eugene Cook, M.D., acted negligently and failed to exercise the degree of care and skill that is expected of reasonably competent and prudent obstetrician [sic] acting under the same or similar circumstances, including but not limited to failing to order an ultrasound to confirm the diagnosis of an intrauterine fetal demise, and such negligence was a substantial factor in causing the Plaintiff, Taylor Gipson, to suffer from and to continue to suffer from severe emotional injury and distress which has significantly affected her life requiring ongoing treatment and counseling and expenses for the same.

19. During her care and treatment of the Plaintiff, Taylor Gipson, and her unborn son, during their admission to

Murray-Calloway County Hospital on November 13th and 14th of 2012, the Defendant, Ellen M. Burnett, M.D., acted negligently and failed to exercise the degree of care and skill that is expected of reasonably competent and prudent obstetrician [sic] acting under the same or similar circumstances, including but not limited to failing to order an ultrasound to confirm the diagnosis of an intrauterine fetal demise, failing to monitor or otherwise evaluate for fetal status, failing to intervene on behalf of the fetus, including transferring mother and baby to another facility, failing to have a pediatrician in attendance to resuscitate the baby, and inducing the premature delivery of the baby with a utero-tonic drug, and such negligence was a substantial factor in causing the Plaintiff, Taylor Gipson, to suffer from and to continue to suffer from severe emotional injury and distress which has significantly affected her life requiring ongoing treatment and counseling and expenses for the same.

To be sure, Gipson represents that she has never claimed Drs. Burnett and Cook should be liable for the wrongful death of Xaedyn. Nor, in any capacity, could Gipson have asserted such a claim: every expert and medical professional who provided evidence in this matter unequivocally testified that Xaedyn was not viable; and in Kentucky, viability remains a prerequisite to maintaining an action for an unborn child's wrongful death. *See Miller v. Bunch*, 657 S.W.3d 890, 896 (Ky. 2022) (footnote omitted) (reaffirming that "a viable fetus is a 'person' for the purposes of KRS[13] 411.130, and that a wrongful death suit may accordingly be maintained for the negligent death of a viable fetus").

---

[13] Kentucky Revised Statute.

Nevertheless, under the auspices of at least part of her negligence claim, Gipson has asserted what effectively amounts to an indirect wrongful death action. For example, she seeks damages for emotional distress stemming from Dr. Burnett's alleged

> failing to intervene on behalf of the fetus, including
> transferring mother and baby to another facility, failing to
> have a pediatrician in attendance to resuscitate the baby,
> and inducing the premature delivery of the baby with a
> utero-tonic drug[.]

In her brief, Gipson also asserts she had a "strong desire to give her unborn child every chance to survive"; Burnett "cannot argue that Xaedyn's chance of survival at his gestational age was zero or otherwise impossible"; and that Burnett's purported failures cost her those *chances*, along with "peace of mind that everything that could have been done was done."

Insofar as Gipson is attempting to recover emotional distress damages for any failure to prevent her miscarriage and the consequent death of her baby, we agree with Drs. Burnett and Cook that Gipson cannot do so. The undisputed evidence – even from Gipson[14] and her own expert[15] – demonstrates that even if

---

[14] Relative to this point, Gipson testified:

> COUNSEL: Did you understand either when that conversation took place or even
> before that the baby being in the – one, having a prolapsed cord and there kind of
> in the vaginal vault or halfway through the cervix, that the baby was going to be
> born, you couldn't – there was no medical procedure whereby the baby could be
> pushed back upwards and somehow miraculously put inside a placenta?
> GIPSON: I knew that.

Burnett had not provided Gipson Cytotec to augment labor and induce the premature delivery of the baby, Gipson would have naturally miscarried perhaps a few hours later; and that even if Gipson had been transferred to another facility, or if a pediatrician had been consulted or resuscitative measures had been implemented, the baby would not have survived.

Furthermore, even if some evidence of record demonstrated the baby might have had a *chance* of a better outcome in the absence of Dr. Burnett's or Dr. Cook's purported failures – and no such evidence exists – a lost or diminished *chance* of recovery or better medical result due to negligence is not a compensable injury in Kentucky. *See, e.g.*, *Kemper v. Gordon*, 272 S.W.3d 146 (Ky. 2008). It follows that Gipson's emotional distress stemming from what she *perceived* was her baby's loss of such a chance (*e.g.*, Gipson's lost "peace of mind that everything that could have been done was done") is not compensable, either.

---

COUNSEL: Okay. And you also knew that the baby at – was this 21 and –
GIPSON: Six days.
COUNSEL: – six-sevenths?
GIPSON: Yes, sir.
COUNSEL: Was not going to survive?
GIPSON: I still believed that he could.
COUNSEL: Just a matter of belief again? It's not medically a fact? It's not anything Dr. Lain told you, it's just –
GIPSON: No. Nobody told me that.
COUNSEL: It's just a belief?
GIPSON: (Witness nods head in the positive.)

[15] At the start of his deposition, Gipson's expert, Dr. Landon, bluntly stated: "I don't think I'm representing to you that this baby was salvageable, so to speak, on the 13th or 14th of November 2012."

-24-

Gipson's claim, as set forth in her complaint, also asserts emotional distress damages stemming from the fact that Dr. Cook indicated prior to her delivery that her baby was dead when it was still alive. It is uncontested that at all relevant times Gipson explicitly and repeatedly voiced her wish not to induce labor unless the baby inside her was dead or her life was threatened; and that she only agreed to induce labor because she had been effectively informed through a misdiagnosis that the baby was dead.

But, even if Drs. Cook and Burnett had informed Gipson before delivery that the baby was still alive, it is uncontested – particularly with the benefit of hindsight – that any such information would have come with a morbid caveat: shortly after being born, the baby *would* die. Gipson cites nothing in the evidence indicating that if she had known that dire prognosis instead, it would have been less emotionally distressing for her.

The only other "emotional distress" Gipson purportedly sustained due to the misdiagnosis of her baby's death was described in Paragraph 13 of her complaint. There, she alleged:

> At the time of delivery, the Defendant Burnett did not immediately tell Taylor Gipson that her son was born alive nor was Ms. Gipson given an opportunity to hold or see her son while he was alive.

In her appellate brief, she characterizes this allegation as her resulting inability to give her baby a "dignified death." As indicated, Gipson appears to

associate much, if not all, of her meaning of that phrase with her[16] inability to be with the baby during its 48-minute lifespan.

To that point, however, even Gipson's expert, Dr. Landon, agreed that if Gipson was not medically stable during the baby's 48-minute lifespan, it would not have been medically appropriate to attempt any "bonding" between her and the baby during that time. Dr. Landon also conceded that Gipson's post-delivery hemorrhage rendered her unstable; that Cytotec did not cause Gipson's hemorrhage; and that he could not say with any certainty that Gipson would not have hemorrhaged – or hemorrhaged to any lesser degree – if she had miscarried the baby naturally at some later point in time instead.

Furthermore, the evidence that Gipson *was* medically stable during the baby's brief lifetime is tenuous if not wholly contradicted by the record. To the extent Gipson cites any such evidence in her brief, she merely presents – in footnote 84 of her brief – a general citation to eight pages of Dr. Landon's deposition. Upon review, those eight pages fail to demonstrate Dr. Landon offered any relevant testimony. He had no personal knowledge of the underlying events and was merely asked during his deposition whether he was aware if Gipson's parents, contrary to Dr. Burnett's version of events, may have suggested in their

---

[16] In her appellate brief, Gipson now suggests she might have sustained less emotional distress if Burnett had also told her *parents* that the baby was born alive and had given *them* an opportunity to hold or see it while it was alive. We will not address this point because that is not the claim Gipson asserted.

-26-

separate depositions that there could have been a few minutes between the birth and death of the baby where Gipson, despite her hemorrhage, could have been lucid and medically stable. Dr. Landon indicated he was uncertain.

To be clear, the two medical professionals who witnessed Gipson's delivery testified that Gipson could not have been with the baby during its 48-minute lifespan because Gipson was hemorrhaging blood and required emergency medical attention at that time. In her deposition, Burnett testified:

> COUNSEL: All right. In the delivery itself, is it your testimony that you recognized immediately there was a problem with the mother, or did that occur five or more minutes after the delivery?
>
> BURNETT: When I went in to cut the cord, take the baby to the warmer, the blood was pooling there.
>
> COUNSEL: Okay.
>
> BURNETT: So it was at that point I knew we needed to be assessing the [. . .] mom. I don't know the timing of when the blood pressure was taken, but it was pretty obvious looking at the amount of blood that was there. And it didn't take long before the patient herself was getting pale; her blood pressure was going down and the pulse rate was going up. All that was happening pretty much concurrent at the time that that baby was born.

Lisa Davis, a registered nurse who was in the room at the time of the delivery, agreed that there was no time for Gipson to hold the baby during that 48-minute window because "she was bleeding to death, hemorrhaging."

Moreover, Gipson herself testified that she passed out after giving birth due to the loss of blood:

> COUNSEL: Did you revive again between the time of 4:00 and 4:50 when the baby passed?
>
> GIPSON: Not that I know of.
>
> COUNSEL: So for them to have informed you of what they knew, which was that the baby was still technically alive, they would have had to go to your bedside and/or demand Dr. Burnett or somebody to wake you up to give you something wake you up to give you the opportunity to say, "Oh, yes, I do want to hold the baby while it's technically still alive," or "I don't," right?
>
> GIPSON: I wasn't woke up to do any of that.

Upon extensive review of the record, the only evidence somewhat deviating from what is set forth above appears in the deposition testimony of Gipson's mother, Kimberly Gipson. Kimberly was uncertain how soon after delivery Gipson started hemorrhaging blood. She recalled her husband asked to speak with Burnett in the hallway after the delivery at "probably maybe 4:15, 4:20" because her husband believed he saw the baby move. Kimberly testified that upon her husband's return to the room, she noticed Gipson was losing blood, and that Burnett then ordered a blood transfusion. However, Kimberly indicated she was uncertain about this chronology:

> COUNSEL: Did this conversation with Dr. Burnett in the hallway happen after Taylor said, Mom, I don't feel good and had blood pooling?

-28-

KIMBERLY:  I believe it was before.  I'm thinking.  I think we had already talked to Dr. Burnett out in the hallway, and then when I came in Taylor had said, Mom, I don't feel good, something is wrong.

By contrast, Kimberly's husband – Kristopher Gipson – testified he did not leave the room to speak with Burnett after the delivery:

COUNSEL:  And shortly thereafter you had a conversation with Dr. Burnett in that room right next to the baby?

KRISTOPHER:  Yeah.  While the baby was laying there.

COUNSEL:  Was Dr. Burnett near the warmer where the nurses were treating the baby when this conversation took place?

KRISTOPHER:  Yes.

COUNSEL:  Okay.  The conversation didn't take place out in the hallway?

KRISTOPHER:  No.

Kimberly's timeline of events is not clear and satisfactory evidence that Gipson's inability to be with the baby during its 48-minute lifespan was attributable to medical negligence.  It is equivocal and would at most leave a factfinder to speculate that Gipson *might* have been medically stable enough to hold the baby at some point between its birth at 4:02 a.m. and her emergent blood transfusion at 4:25 a.m. – a brief period when the nurses were otherwise tending to

the baby on the warmer, and Gipson was pale, losing blood, and – as Gipson herself testified – had lost consciousness.

We have addressed the alleged sources of Gipson's emotional distress set forth in her complaint. We must concede Gipson experienced emotional distress from the ordeal she suffered. That much is not in doubt. However, Gipson has failed to present clear and satisfactory evidence that her emotional distress was caused by **actionable** negligence. *Glass*, 996 S.W.2d at 454. The consequences of the presumptive diagnosis of intrauterine fetal demise, including the steps taken after that mistake, cannot be shown to have caused Gipson's emotional distress with any differentiation from the emotional distress which would otherwise have been experienced if Gipson had been stable enough during the forty-eight minutes during which Xaedyn's heart was beating to hold him. Xaedyn could not see his mother or otherwise interact with her as he struggled to breath with underdeveloped lungs. While this case presents an unimaginably tragic situation, it does not sustain an actionable claim of all the elements of negligence. Accordingly, the circuit court did not err in dismissing Gipson's medical negligence claims against Drs. Burnett and Cook and Murray Woman's Clinic.

### CONCLUSION

For the reasons discussed above, we AFFIRM.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Paul A. Casi, II
Jeff W. Adamson
Michael R. Hasken
Louisville, Kentucky

BRIEF FOR APPELLEES LORAINE ELIZABETH COOK AND CHARLES EUGENE COOK, JR., CO-EXECUTRIX/ EXECUTOR OF THE ESTATE OF CHARLES EUGENE COOK, M.D., DECEASED; AND MURRAY WOMAN'S CLINIC, PLLC:

Gerald R. Toner
Katherine Kerns Vesely
Leah T. Scharff
Louisville, Kentucky

BRIEF FOR APPELLEE ELLEN BURNETT, M.D.:

Matthew S. Eddy
E. Frederick Straub, Jr.
Paducah, Kentucky

BRIEF FOR APPELLEE CALLOWAY COUNTY PUBLIC HOSPITAL CORP.:

Richard L. Walter
Paducah, Kentucky