RENDERED: JANUARY 18, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0302-DG

SAINT ELIZABETH MEDICAL CENTER,                       APPELLANT
INC., D/B/A
ST. ELIZABETH FLORENCE


|  | ON REVIEW FROM COURT OF APPEALS |
|---|---|
| V. | NO. 2021-CA-0115 |
|  | BOONE CIRCUIT COURT NO. 16-CI-01672 |


RONALD N. ARNSPERGER, JR.                              APPELLEE


**OPINION OF THE COURT BY JUSTICE CONLEY**

**<u>REVERSING</u>**

This case is before the Court upon discretionary review sought by the Appellant, Saint Elizabeth Medical Center, Inc. (St. Elizabeth), after the Court of Appeals reversed the summary judgment granted by the Boone Circuit Court. The Court of Appeals' decision rested on the conclusion that this case was a simple negligence case and that "no expert medical testimony is necessary to determine the duty of a hospital staffer driving a wheelchair or to gauge whether that duty was breached." Upon review, we reverse the Court of Appeals. The question of this case turns not upon the duty or breach thereof of a hospital staffer navigating a wheelchair-bound patient. Instead, the question is whether the injuries Arnsperger claims to have suffered were *caused* by the allegedly negligent actions of the hospital staffer. Given the medical

background of Arnsperger, the question of causation is not one within the common knowledge of the jury. As such, expert medical testimony was necessary and the lack of expert testimony on behalf of Arnsperger as to the element of causation merited summary judgment. The Court of Appeals is reversed, and we reinstate the summary judgment of the trial court.

## I.      Facts and Procedural Posture

Arnsperger is a baseball umpire with an extensive medical history involving his left ankle. In May 2015 he was diagnosed with Complex Regional Pain Syndrome (CRPS) in the left ankle. CRPS causes the sufferer to feel exaggerated pain responses to soft or light touches that in a normal person would not elicit the same pain response. In August of 2015, he injured his left ankle while umpiring. He went to Dr. Bilal Shamsi for treatment. Dr. Shamsi and Arnsperger agreed a surgical repair was necessary.

On December 14, 2015, Arnsperger went in for surgery. The goal, as Dr. Shamsi testified in deposition, was to create an osteotomy and then align and fix the osteotomy with two screws. In layman terms, Dr. Shamsi intentionally fractured the ankle by sawing into the medial malleolus—the prominent bone on the inside of the ankle—in order to fix the underlying condition, then to realign and fix the fracture with two screws. The surgery did not go as planned. As Dr. Shamsi was drilling a hole in the bone for one of the screws, the drill bit broke and shards were scattered in the ankle. Most were removed except two. A further result of this complication was that there was not enough bone to create another hole for the second screw. Nonetheless, Dr. Shamsi was able to

2

place one screw in and there was some hope that would suffice to heal Arnsperger. Notes from Dr. Shamsi after the operation stated that Arnsperger was made aware of the possibility for additional surgery, but no x-rays were taken that day. Dr. Shamsi told Arnsperger he needed to get x-rays to confirm the proper alignment of the bone.

On December 17, 2015, a follow-up visit was conducted. Dr. Shamsi performed a naked eye examination of the exterior of the ankle and believed all looked well. But he once again told Arnsperger he needed to get x-rays of the ankle, which Dr. Shamsi's office was unable to perform. The following day, Arnsperger was again informed via voicemail that he needed to get x-rays. Arnsperger called Dr. Shamsi's office complaining of intense pain in the ankle. Dr. Shamsi via his assistant, reminded him to get the x-rays and arranged for a pain medication prescription. Arnsperger went to St. Elizabeth's for x-rays on December 18.

When he arrived, a hospital staffer greeted Arnsperger with a wheelchair. While navigating the hospital an incident occurred in which Arnsperger's extended left ankle made contact with a desk. There is a factual dispute about the severity of the collision. Arnsperger describes it as his ankle being rammed into the desk, while St. Elizabeth contends it was nothing more than a slight bump. The video of the incident is not clear. Despite this incident, x-rays were taken. The x-rays showed a lateral displacement in the osteotomy; i.e., the fracture was not correctly aligned. Dr. Shamsi reviewed the x-rays and

concluded another surgery was necessary. That surgery was conducted on December 24, 2015.

On December 15, 2016, Arnsperger filed suit against St. Elizabeth. In the facts giving rise to the complaint, Arnsperger alleged that the impact his left ankle had with the desk "directly and proximately caused by the negligence of the unknown female St. Elizabeth Florence employee had caused a displaced fracture of the left ankle and had dislodged the surgical screw that was placed during the December 14, 2015 surgery." In the First Claim for Relief for negligence and vicarious liability, Arnsperger alleged

> The unknown female St. Elizabeth Florence employee's negligent, grossly negligent, and careless transportation of the Plaintiff caused the Plaintiff's surgically repaired ankle to be forcefully impacted into a registration desk, displacing the surgical hardware recently inserted into the bone in his ankle, necessitating a second, more invasive surgical procedure that permanently restricts Plaintiff's range of motion in his left ankle.

Arnsperger alleged two other counts, negligent failure to train and supervise and an independent negligence count against St. Elizabeth. For both counts, he reaffirmed the above-quoted allegation.

In August 2018, Arnsperger identified two experts: Dr. Shamsi and Dr. Robert Klickovich. The latter was Arnsperger's treating physician prior to the surgeries at issue and had diagnosed Arnsperger with CRPS. The expert disclosure stated that Dr. Shamsi was

> expected to provide expert medical opinions regarding the recovery he expected Plaintiff to be able to make after the December 14, 2015 surgery, and state his opinion whether Plaintiff would be able to return to his work as a baseball umpire, and/or other similar

4

physically demanding work but for the injury he suffered on December 18, 2015.

It was also stated Dr. Shamsi would testify "about the adverse effect that the injury Plaintiff suffered as a result of being rammed into the St. Elizabeth registration desk . . . has had and will continue to have on his ability to perform work . . . ." It is obvious that none of these disclosures relate to the causation of the injury but rather presumes causation. Dr. Klickovich was "expected to provide expert opinions regarding Plaintiff's future treatment options and prognosis, as well as the adverse effect that Plaintiff's injury suffered . . . and will continue to have on his ability to perform work . . . ." Again, this is not an expert opinion on causation.

Dr. Shamsi was deposed on January 28, 2019. He testified to first being aware he was identified as an expert that same day. Dr. Shamsi did testify that on his follow-up examination of December 17, 2015, he saw nothing wrong and did not believe a second surgery would be necessary. But Arnsperger overlooks the fact that Dr. Shamsi told him that same day, and had his office call him the next morning, to get x-rays. Dr. Shamsi also conceded that some incident occurred on the morning of December 18 prior to the x-rays taking place. Once again, however, Arnsperger overlooks the fact that Dr. Shamsi refused to, in his words, "speculate" as to what the nature of the incident was or its effects on Arnsperger's ankle. Dr. Shamsi testified he had not even seen the video surveillance video of the incident. When asked directly if "it is safe to conclude that the traumatic injury that Ron suffered on December 18th to the surgical site is what caused the second surgery to be required?" Dr. Shamsi disclaimed

5

any opinion. Dr. Shamsi instead referred to Arnsperger's ankle displacement as "hardware failure" and affirmed he would not be offering any testimony as to causation.

After this deposition, a motion for summary judgment was filed by St. Elizabeth for failure to provide expert testimony as to causation. Arnsperger opposed, arguing expert testimony was unnecessary but that he had identified both Dr. Shamsi and Dr. Klickovich. The trial court denied summary judgment because Dr. Klickovich had yet to be deposed but did affirm that expert medical testimony as to causation would be required.

Dr. Klickovich was deposed on August 20, 2020. Dr. Klickovich also testified he was unaware he had been disclosed as an expert witness. He testified he had not even been contacted about giving testimony in the case until August 3, 2020. He testified he was unaware of the details of Dr. Shamsi's surgery on December 14, 2015, including that an osteotomy had been created. He had not reviewed the x-rays taken on December 18, 2015. When asked, "do you know to a reasonable degree of medical probability whether or not the contact with the wall did, in fact, shift Mr. Arnsperger's hardware?" he replied "No." He disclaimed any intention of testifying on the causal link between the December 18 collision to the ankle displacement; to testifying about the cause at all; and why the second surgery was required.

Dr. Mihir Patel, whom Arnsperger did not depose, filed his affidavit on May 31, 2019. In that affidavit, he identified himself as an expert to offer testimony as to the causal nature of Arnsperger's displaced ankle. He stated he

6

had reviewed his medical history and the video surveillance footage. Dr. Patel stated the displaced osteotomy identified in the December 18 x-rays "most likely emerged from his first surgery" and that "[i]n light of the surgical complications and Plaintiff's pre-existing conditions, a slightly displaced osteotomy was likely the best fixation the surgeon could accomplish." He also stated that even assuming the ankle had been "optimally fixated" after the first surgery, the collision seen on the surveillance video could not have caused the displacement, but "a much more violent impact would have been required to generate a displacement, particularly while Plaintiff was wearing a splint." Finally, he concluded the second surgery was necessary to correct the "suboptimal fixation" resulting from the first surgery.

Based upon the depositions and consistent with its own ruling that expert medical testimony was required on causation, the trial court granted summary judgment on December 21, 2020. Arnsperger appealed. The Court of Appeals reversed. It did so based on its agreement with Arnsperger that the "injuries do not require a medical expert to relay to a layperson the cause-and-effect relationship between the [hospital staffer] employee's conduct and Arnsperger's injury."

## II.    Standard of Review

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." CR[1] 56.03. "[T]he proper function of summary judgment is to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky. 1991). "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Id.* A grant of summary judgment is reviewed *de novo. Ashland Hosp. Corp. v. Lewis,* 581 S.W.3d 572, 577 (Ky. 2019).

It is elementary for all tort cases that the plaintiff must establish a duty, breach thereof, causation, and injury. "In medical malpractice cases the plaintiff must prove that the treatment given was below the degree of care and skill expected of a reasonably competent practitioner and that the negligence proximately caused injury or death." *Reams v. Stutler,* 642 S.W.2d 586, 588 (Ky. 1982). "The burden of proof in a malpractice case is, of course, on the party charging negligence or wrong. That must be established by medical or expert testimony unless the negligence and injurious results are so apparent that laymen with a general knowledge would have no difficulty in recognizing it." *Johnson v. Vaughn,* 370 S.W.2d 591, 596 (Ky. 1963). The failure to provide expert medical testimony when necessary is "truly a failure of proof" and merits summary judgment. *Adams v. Sietsema,* 533 S.W.3d 172, 177 (Ky. 2017) (quoting *Blankenship v. Collier,* 302 S.W.3d 665, 668 (Ky. 2010)).

---

[1] Kentucky Civil Rules of Procedure.

### III.    Necessity of Expert Medical Testimony

That a medical malpractice case may, in certain circumstances, proceed to trial without expert medical testimony when duty, breach, causation, and injury are readily apparent within the common knowledge of a jury has been frequently described as the "layman's exception" in this case, but that term is a bit of a misnomer. The "layman's exception" is in fact nothing other than the application of *res ipsa loquitur*—the thing speaks for itself. *Perkins v. Hausladen*, 828 S.W.2d 652, 654-55 (Ky. 1992); *Lewis*, 581 S.W.3d at 578. It seems from this case that this doctrine is in danger of becoming unmoored from its foundational principles, necessitating some exposition on its content and application. Indeed, it is not the first time in recent history this Court has felt the need to check an unwarranted expansion of *res ipsa loquitur* for questions of causation in the medical context. *Lewis*, 581 S.W.3d at 579.

*Res ipsa loquitur* applies in medical malpractice cases when "any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care" or "when 'medical experts may provide a sufficient foundation for *res ipsa loquitur* on more complex matters.'" *Hausladen*, 828 S.W.2d at 655 (quoting *Paintsville Hosp. Co. v. Rose,* 683 S.W.2d 255, 256-57 (Ky. 1985)). The former is "illustrated by cases where the surgeon leaves a foreign object in the body or removes or injures an inappropriate part of the anatomy." *Id.* at 654. The latter occurs when expert testimony establishes the "type of injury was not an ordinary risk of the surgery, that the method by which it occurred was within

the exclusive control of the defendant, and that the injury was not due to any voluntary action or contribution on the part of the plaintiff." *Id.* at 655.[2] In other words, "when the circumstances and the probabilities as to the *causative factors of an accident* lie within the ken of experts, *expert evidence is necessary* to establish a foundation that gives rise to an inference of negligence." 65A C.J.S. *Negligence* § 820 (emphasis added).

Crucial to remember is *res ipsa loquitur* "allows an inference of negligence in certain cases, *not causation*; established causation is a prerequisite to the application of the doctrine." *Id.* at § 821 (emphasis added). "A lack of knowledge as to the cause of the accident does not call for the application of the doctrine." *Cox v. Wilson*, 267 S.W.2d 83, 84 (Ky. 1954). That "[t]he plaintiff's injury must have resulted from the accident[,]" is a basic element of *res ipsa loquitur* in Kentucky. *Id. See also Quillen v. Skaggs*, 25 S.W.2d 33, 34-35 (Ky. 1930). *Res ipsa loquitur* "must be linked with the injury suffered. There may be an inference of negligence when, according to common knowledge and experience, *the accident would not have happened except for* the wrongful act of the defendant." *Jos. N. Rice Co. v. Grayson*, 341 S.W.2d 238, 239 (Ky. 1960). The doctrine is therefore inapplicable where more than one cause can be inferred from the evidence. *Schroerlucke v. McDaniel Funeral Home, Inc.*, 291 S.W.2d 6,

---

[2] There is also a second type of case that does not require expert medical testimony on the part of the plaintiff, and which we distinguish from *res ipsa loquitur*—"where the defendant physician makes certain admissions that make his negligence apparent." *Sietsema*, 533 S.W.3d at 179 (quoting *Blankenship*, 302 S.W.3d at 670)).

8 (Ky. 1956). "[T]he doctrine [can] be applied only when the nature of the accident itself not only clearly supports the inference of negligence on the part of the defendant but excludes all other inferences that it might be due to one or more causes of which the defendant is not responsible." *Id.* at 9.

Arnsperger has steadfastly maintained that the December 18 collision was a "re-injury" and that no other incident occurred between December 14 and 18 that could have "re-injured" his left ankle. He (and the Court of Appeals) focuses on the hospital staffer and the collision to argue this "re-injury" could not have happened but for negligence. But this use of the word "re-injury" and the narrow focus on the December 18 collision is a linguistic sleight-of-hand meant to avoid the fact that whether the left ankle had been properly aligned after the December 14 surgery was an open question at the time the collision occurred on December 18. His own physician, Dr. Shamsi, could not make that conclusion definitively without x-rays. The injury is not linked to the accident[3] to such a degree that a layman can infer, without the aid of expert testimony, that it is more probable than not the injury would not have occurred but for the collision. *Id.* at 8; *Hausladen*, 828 S.W.2d at 656.

---

[3] Indeed, Dr. Shamsi's deposition reveals that on December 17, 2015, Arnsperger reported to Dr. Shamsi's assistant that he had hit his left foot and was prevented from taking the x-rays on that day as a result of the collision. So not only is there a dispute as to whether the hospital staffer's alleged negligence on December 18, 2015, caused Arnsperger's ankle displacement, but there is evidence in the record to suggest that a collision on December 17, 2015, occurred as well that Arnsperger has not made a claim of negligence for. This underscores how critical the element of causation is in this case and why a jury cannot infer from the mere occurrence of the December 18, 2015, collision that said collision caused his claimed injury.

A second issue is that Arnsperger has throughout the litigation maintained that his claim is not a medical malpractice claim, but one of ordinary negligence, and therefore expert medical testimony is not necessary. As we have said, not every medical malpractice case requires expert testimony, *Sietsema*, 533 S.W.3d at 177; but that does not mean that every ordinary negligence case amounts to *res ipsa loquitur. Cox*, 267 S.W.2d at 84. Only when the

> (1) [t]he defendant had full management and control of the instrumentality which caused the injury[;] (2) . . . according to common knowledge and the experience of mankind, the accident could not have happened if those having control and management had not been negligent[; and] (3) [t]he plaintiff's injury must have resulted from the accident[,]

does *res ipsa loquitur* apply, even in ordinary negligence cases. *Id.* Since causation is a prerequisite to the rule's application, a case wherein causation is a matter of good-faith dispute precludes its application. We are content to concede that Arnsperger and the Court of Appeals are correct that the standard of care for a hospital staffer pushing a wheelchair-bound patient needs no expert testimony. But that overlooks the fact that Arnsperger has always assumed the collision with the desk caused his injury, whereas his medical history in the days preceding the collision and the medical testimony of Dr. Shamsi and Dr. Patel call that assumption into doubt. The thing does not speak for itself. The instrumentality which caused the injury is disputed, thus, that the injury was caused by the desk collision is also disputed.

This disputed question of causation is beyond the common knowledge of the jury. The error of the Court of Appeals lay entirely on its narrow focus on

12

the elements of duty and breach for the hospital staffer pushing Arnsperger in his wheelchair, when the issue is whether the act of pushing Arnsperger into the desk *caused* his claimed injuries. As such, the fact that Arnsperger only days earlier had a surgery on the left ankle, and the successful outcome of that surgery was in question at the time of the injury, is critical to properly determining the question before us. In as simple terms as possible, the question is whether a jury could conclude that the lateral displacement in Arnsperger's left ankle was caused by the desk collision on December 18 merely from the fact that the desk collision occurred. It could not.

As recounted in Section I, Arnsperger has an extensive medical history involving his left ankle, including surgeries prior to the two involved in this case. He also has Complex Regional Pain Syndrome in the same ankle—a syndrome that magnifies the pain response in the sufferer beyond what an ordinary person would feel if they had been touched or impacted in the same manner. And most importantly to our decision are the facts that only four days prior to the collision, Arnsperger underwent a surgery in which the surgeon fractured the bone, was unable to realign the bone as originally planned due to a traumatic drill bit failure, and was unable to conclusively determine without x-rays whether the ankle bone had been properly aligned despite the drill bit failure. It is beyond the common knowledge of the jury to simply look at these facts and infer that the ankle had been properly aligned at the December 14 surgery and that, therefore, the lateral displacement found on December 18 must have been caused by desk collision. Such a question is manifestly beyond

13

the competence of a layman. Neither Dr. Shamsi nor Dr. Klickovich offered any testimony as to that causal fact, and Dr. Patel's expert disclosure stated that he would be offering testimony that the lateral displacement found on December 18 was a result, i.e., caused by, the December 14 surgery, and not the desk collision.

Even assuming this is not a medical malpractice case in the strict sense, causation is still a disputed element of Arnsperger's negligence tort claim and the trial court concluded that expert testimony was necessary. The necessity of expert testimony is an evidentiary question committed to the sound discretion of the trial judge. *Sietsema*, 533 S.W.3d at 178. The Court of Appeals opined that this case was similar to *Young v. J.B. Hunt Transp., Inc.*, 781 S.W.2d 503 (Ky. 1989), and concluded "an expert medical witness was not needed to testify to the negligence of the driver or drivers of the vehicles involved. Similarly, no expert medical testimony is necessary to determine the duty of a hospital staffer driving a wheelchair or to gauge whether that duty was breached." With due respect to the lower court, that is a misreading of *Young*. Not one word in *Young* addressed the necessity of expert medical testimony regarding the negligence of a vehicle driver. What *Young* addressed was the attempt by the defendant in that case "[a]t the conclusion of testimony, but before the close of their evidence . . . [to admit] a large volume of hospital records without there having been any witness [to] comment upon or explanation of the records to the jury." *Id.* at 508. We affirmed the trial court's refusal to admit those records because "without the prior treating physician or any physician available to

14

explain the records, counsel would have been free to draw whatever conclusions they wished without fear of evidentiary contradiction." *Id. Young* is inapposite to this case. The issue is not elements of duty or breach of the hospital staffer, but causation of injury. Causation cannot be established from the mere occurrence of the December 18 desk collision given the December 14 surgery and its disputed result.

### IV.    Conclusion

The trial court concluded expert testimony was necessary as to the element of causation and Arnsperger needed to produce an expert medical physician who could opine that the desk collision caused the lateral displacement in his left ankle. *Res ipsa loquitur*—colloquially referred to as the "Layman's Exception"—is only applicable where causation is established, and no other inference but the defendant's negligence is supported. *Cox*, 267 S.W.2d at 84; *Schroerlucke*, 291 S.W.2d at 9. This is true whether Arnsperger has brought a medical malpractice claim or an ordinary negligence claim, since Kentucky law allows medical experts to testify to establish "sufficient foundation for *res ipsa loquitur* on more complex matters." *Hausladen*, 828 S.W.2d at 655. Given the peculiar medical history of Arnsperger in the days leading up to December 18, specifically regarding his left ankle, it is beyond the common knowledge of the jury to conclude Arnsperger's laterally displaced ankle bone was caused by the desk collision merely from the fact that the collision occurred. Arnsperger has identified no expert who would opine that the desk collision caused the lateral displacement on December 18. St.

15

Elizabeth has identified an expert who would testify the lateral displacement was caused by the December 14 surgery. Therefore, Arnsperger has failed to raise a genuine issue of material fact, and this failure means that under no circumstances could his claim succeed. The Court of Appeals is reversed, and we reinstate the summary judgment of the trial court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Ellen M. Houston
Michael J. Enzweiler
Dressman Benzinger LaVelle PSC

COUNSEL FOR APPELLEE:

Shane C. Sidebottom
Ziegler & Schneider, PSC

Justin A. Sanders
Rittgers Rittgers & Nakajima